# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JENI RIEGER, ALOHA DAVIS, JODIE CHAPMAN, CARRIE VASSEL, KAREN BURNAUGH, TOM GARDEN, ADA and ANGELI GOZON, HERNAN A. GONZALEZ, PATRICIA A. HENSLEY, CLYDIENE FRANCIS, PETER and GUNNEL LOWEGARD, and GRANT BRADLEY individually, and on behalf of a class of similarly situated individuals,<br><br>                    Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a AUDI OF AMERICA, INC., AUDI AG, a German corporation, and VOLKSWAGEN AG, a German corporation,<br><br>                    Defendants. | Civil Action No.: 1:21-cv-10546-NLH-MJS<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Plaintiffs Jeni Rieger, Aloha Davis, Jodie Chapman, Carrie Vassel,

Karen Burnaugh, Tom Garden, Ada and Angeli Gozon, Hernan A. Gonzalez,

Patricia A. Hensley, Clydiene Francis, Peter and Gunnel Lowegard, and Grant

Bradley ("Plaintiffs") bring this action for themselves and on behalf of all similarly situated persons ("Class Members") in the United States who purchased or leased any 2012-2017 Audi vehicle equipped with 2.0-liter turbocharged engines ("Class Vehicles")[1] against Volkswagen Group of America, Inc., ("VWGoA") d/b/a Audi of America, Inc., Audi AG, and Volkswagen AG ("VWAG") (collectively "VW" or "Defendants"). The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.     This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

3.     Defendants VWAG, Audi AG, or both, designed and manufactured the Class Vehicles, and Defendant VWGoA imported, distributed, marketed, and sold the Class Vehicles through its extensive network of authorized dealerships in the United States. Defendant VWGoA also provides service and maintenance for the Class Vehicle at dealers and service providers nationwide, using information provided by VWAG, Audi AG, or both.

4.     Defendants sold, directly or indirectly, through their agent dealers and other retail outlets, the Class Vehicles throughout the United States, without

---

[1] The Class Vehicles are any 2012 through 2017 model year Audi vehicles equipped with a 2.0-liter turbocharged engine. These vehicles include the following Audi models: TT, A3, A4, A5, A6, Q3, and Q5.

disclosing that the Class Vehicles' were equipped with defective turbocharged 2.0-liter engines ("2.0T Engine").

5.     VW's history of trouble with the 2.0T Engine is extensive, with the subject engine being the genesis for other class action lawsuits for excessive oil consumption in its 2009-2011 model year vehicles, and for the defective timing chain design for its 2008-2013 and its 2012-2019 model year vehicles.[2] These actions ultimately led VW to extend its warranty periods and reimburse claimants for unforeseeable costs related to the defective designs within the 2.0T Engines.[3]

6.     VW wrongfully and intentionally concealed a defect in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads such that the piston rings do not seat properly in the grooves of the piston head ("Piston Defect") in the 2.0T Engine. The Piston Defect can cause the pistons and the engine itself to fail at any time. It can also cause the engine to consume an excessive amount of oil, because the combustion chamber is not properly sealed off from the parts of the engine which require engine oil for lubrication.  The Piston Defect also results in the shrapnel of the fragments of the piston rings and/or minute pieces of the piston head circulating throughout the engine, damaging other engine

---

[2] *See Asghari v. Volkswagen*, 42 F.Supp.3d 1306 (C.D. California, 2013); *see also In Re Volkswagen Timing Chain Product Liability Litigation* 2017 WL 1902160 (D.N.J. May 8, 2017); *Opheim v. Volkswagen Aktiengesellschaft*, 2021 WL 2621689 (D.N.J. June 25, 2021).

[3] *Opheim* remains pending.

components.   For example, cylinder scoring is a frequent result of the Piston Defect. As a result of the Piston Defect, Plaintiffs and Class Members incur out of pocket costs to repair or replace the damaged engine parts or their entire engine. A replacement of the piston rings and/or pistons costs thousands of dollars, and the cost for replacing a 2.0T Engine is well over $10,000.

7.      The Piston Defect in the 2.0T Engine also presents a safety risk for Plaintiffs and Class Members, because when a piston or pistons suddenly and unexpectedly fail, the Class Vehicles immediately lose engine power. It goes without saying that a sudden loss of power poses a clear-cut safety risk—it can prevent the driver from accelerating, maintaining speed, and even adequately controlling the steering wheel, engaging the brakes, all of which drastically increase the risk of collisions.

8.      The Piston Defect also causes substantial damage. When the defect manifests, in addition to destroying critical engine components, it causes further damage throughout the powertrain of the Class Vehicles as shards of the pistons are circulating throughout the engine and fuel system.

9.      By way of explanation, in internal combustion engines, the piston is a fast-moving metal component contained within a cylinder. Piston rings attached at the piston head make the piston gas tight. A piston's purpose is to transfer force from expanding gas in the cylinder to the crankshaft via a piston rod and/or

connecting rod. In most, if not all, mass produced car engines, the intake, compression, combustion and exhaust process take place above the piston in the cylinder head, which forces the piston to move up and down within the cylinder, thereby causing the crankshaft to turn. The piston is subjected to tremendous forces and heat during normal engine operation.

10.     Specifically, the pistons and/or piston heads in the Class Vehicles' 2.0T Engine are defective in that they cause excessive oil consumption and crack, fracture, or splinter at their point of contact. The damage to the pistons causes immediate loss of compression within the engine cylinder and causes the remnants of the piston to circulate throughout the fuel system of the Class Vehicles. These failures occur before the engine reaches 75,000 miles, resulting in a lifespan well short of the class members' expectations and the industry standard for similar engines.

11.     The Piston Defect is inherent in each Class Vehicle and was present at the time of sale.

12.     VW undertook affirmative measures to conceal the Piston Defect through, among other things, a Technical Service Bulletin ("TSB") that VWGoA issued to its authorized repair facilities (but not to the class members themselves).

13.     VW was sufficiently aware of the Piston Defect from: pre-production testing; design failure mode analysis; aggregate purchases of replacement piston

rings, pistons, and engines; calls to its customer service hotline; and customer complaints made directly to its agent dealers. However, this knowledge and information was exclusively in the possession of VW and its network of dealers who are Defendants' agents for repairs and, therefore, unavailable to consumers.

14.     The Piston Defect is material because it poses a serious safety concern. As attested by Class Members in scores of complaints to the National Highway Traffic Safety Administration ("NHTSA"), and other online forums, the Piston Defect can impair any driver's ability to control his or her vehicle and greatly increase the risk of collision.

15.     The Piston Defect is also material because consumers incur significant and unexpected repair costs. VW's failure to disclose, at the time of purchase, the pistons' marked tendency to fail is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace essential engine components expected to last much longer than 75,000 miles of use.

16.     Had VW disclosed the Piston Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them.

## THE PARTIES

**Plaintiff Jeni Rieger**

17.     Plaintiff Jeni Rieger is a Nevada citizen who is domiciled in Las Vegas, Nevada.

6

18.     On or around August 18, 2016, Plaintiff Rieger purchased a certified pre-owned 2015 Audi A4 Allroad with only 8,000 miles, equipped with the subject 2.0T Engine, from Audi San Diego, an authorized Audi dealer in San Diego, California. As a certified pre-owned vehicle, Plaintiff Rieger's 2015 Audi A4 came with an express warranty provided by VW and must go through a rigorous checklist to confirm that the vehicle contains no defects or damage.

19.     Plaintiff Rieger purchased her vehicle primarily for personal, family, or household use.

20.     Passenger safety and reliability were important factors in Plaintiff Rieger's decision to purchase her vehicle. Before making her purchase, Plaintiff Rieger did an online search for the vehicle on Google. She watched YouTube videos and television ads about the 2015 Audi. Plaintiff visited VW's official website to research the 2015 Audi and its 2.0T engines. Moreover, before making her purchasing decision, Plaintiff Rieger test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Rieger reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Rieger believed that her 2015 Audi would

be a safe and reliable vehicle.

21.     VW's omissions were material to Plaintiff Rieger. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, television ads, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Rieger would have seen and been aware of the disclosures. Furthermore, had she known of the Piston Defect, Plaintiff Rieger would not have purchased her vehicle, or would have paid less for it.

22.     Specifically, on or around October 10, 2020 with approximately 45,000 miles on the odometer of her Audi A4, Plaintiff Rieger presented her vehicle to Walters Audi, an authorized Audi dealership in Riverside, California, complaining of a check engine light which gave a reading indicating "cylinder misfire." Walters Audi performed tests and confirmed that Plaintiff's vehicle had a cylinder misfire due to loss of compression in the engine cylinder. Despite these findings, Walters Audi and VWGoA refused to cover the necessary repairs under warranty. Unable to afford the high out-of-pocket cost, Plaintiff Rieger had no choice but to leave the dealership with her vehicle unrepaired.

23.     Following her unsuccessful repair visit Walters Audi, on November 11, 2020 Plaintiff Rieger's vehicle was transported to Audi Henderson in Henderson, Nevada, and the vehicle continued to exhibit symptoms due to loss of compression in the engine, including but not limited rough starting of the engine,

excessive shuddering and loud operation of the engine, and inability to maintain a consistent idle. Audi Henderson and VWGOA again refused to cover the necessary repairs under warranty.

24.     Accordingly, on or around February 5, 2021, Plaintiff Rieger transported her vehicle to a CarsNV, LLC, a third-party repair facility in Las Vegas, Nevada, complaining that her vehicle was exhibiting the aforementioned symptoms and that it experienced a general loss of power during operation of her vehicle. Upon investigation, CarsNV LLC discovered that her engine needed to be replaced entirely. Accordingly, because of the Piston Defect, and because VWGoA refused to cover the necessary repairs under warranty when Ms. Rieger twice presented her vehicle to Defendants' dealerships, Plaintiff Rieger had to pay an approximate total of $10,059 out of pocket to have her engine replaced, including but not limited to transport fees, purchasing new replacement parts, and labor.

25.     Accordingly, Plaintiff Rieger's vehicle has never been repaired by VW and remains subject to the Piston Defect because the replacement engine and related arts also suffer from the inherent defect having been sourced from VWGoA.

26.     At all times, Plaintiff Rieger, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving.  At all times, Plaintiff Rieger has properly maintained

her vehicle, bringing it exclusively to Audi authorized dealers for service until they failed to repair it.

27.    Although Plaintiff Rieger is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Aloha Davis**

28.    Plaintiff Aloha Davis is a Florida citizen who is domiciled in Palm Coast, Florida.

29.    In or around February 2, 2019, Plaintiff Davis purchased a certified pre-owned 2017 Audi A4 equipped with the subject 2.0T Engine, from Audi Orange Park a/k/a Audi Jacksonville, an authorized Audi dealer in Jacksonville, Florida. At the time of her purchase, the vehicle had approximately 27,000 miles on the odometer.  In addition to the remaining New Vehicle Limited Warranty on her vehicle, Plaintiff Davis also received an extended certified pre-owned warranty.

30.    Plaintiff Davis purchased her vehicle primarily for personal, family, or household use.

31.    Passenger safety and reliability were important factors in Plaintiff Davis's decision to purchase her vehicle. Before making her purchase, Plaintiff Davis did an online search for the vehicle on Google. She read reviews, including

Google Reviews, JD Power, and Edmunds, of the vehicles and visited the Audi corporate and the dealership's websites. Moreover, before making her purchasing decision, Plaintiff Davis test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Davis and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Davis reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Davis believed that her 2017 Audi A4 would be a safe and reliable vehicle.

32.     VW's omissions were material to Plaintiff Davis. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Davis would have seen and been aware of the disclosures. Furthermore, had she known of the Piston Defect, Plaintiff Davis would not have purchased her vehicle, or would have paid less for it.

33.     Specifically, about two weeks after her purchase, with approximately 28,000 miles on the odometer of her Audi A4, Plaintiff Davis began to experience symptoms of the Piston Defect in that her vehicle would lose power while being driven and was consuming excessive amounts of oil, as indicated by the low oil

light illuminating on the dashboard. She called Audi of Orange Park to complain. She presented her vehicle to Audi of Orange Park for repairs on or about February 15, 2019, where they topped it off with oil. She was told nothing was wrong with her vehicle and that she was not in need of an oil change because the oil had been changed immediately prior to her purchase.

34.     In late May 2019, the vehicle was repaired and serviced by Audi of Orange Park after a minor accident, which included a full oil change.

35.     On or about July 29, 2019, Plaintiff Davis presented her vehicle again to Audi of Orange Park, complaining about the excessive oil consumption because the low oil level light came on again. Audi of Orange Park merely changed the oil in her vehicle at a cost of $126.23 and did not perform an oil consumption test.

36.     On or about October 5, 2019, Plaintiff Davis presented her vehicle again to Audi of Orange Park, for a windshield replacement. She also complained about the excessive oil consumption at that time, because the low oil light came on frequently. She had taken to driving with an extra quart of oil in her vehicle, to add to the engine when the low oil light illuminated. Audi of Orange Park did not provide a repair for the excessive oil consumption, and merely performed a 40,000-mile service on her vehicle.

37.     In or around early November 2020, Plaintiff Davis' son took the vehicle to Audi of Orange Park and complained that the vehicle was running

roughly and that the low oil light was still coming on frequently.  Audi of Orange of Park did not perform an oil consumption test but changed the coil packs for approximately $800.

38.    Despite Plaintiff Davis repeatedly asking Audi of Orange Park to repair the vehicle to fix the oil consumption issue, the dealership has never done so.

39.    So far, Plaintiff Davis has spent over $3,000 in diagnostics and repairs and extra oil to her vehicle at the direction of the Audi dealership.

40.    However, Plaintiff Davis's vehicle continues to exhibit the Piston Defect, continues to suffer from a loss of power while driving, experiences engine jerking, running roughly, and excessive oil consumption, and has never been repaired by VW.

41.    At all times, Plaintiff Davis, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, Plaintiff Davis has properly maintained her vehicle according to the maintenance schedules published by VWGoA.

42.    Although Plaintiff Davis is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Jodie Chapman**

43.     Plaintiff Jodie Chapman is a Georgia citizen who is domiciled in Nelson, Georgia.

44.     In or around March 2021, Plaintiff Chapman purchased a used 2017 Audi Q3 equipped with the subject 2.0T Engine, from Atlanta Auto Brokers, a used car dealership located in Marietta, Georgia. At the time of her purchase, the vehicle had approximately 90,000 miles on the odometer.

45.     Plaintiff Chapman purchased her vehicle primarily for personal, family, or household use.

46.     Passenger safety and reliability were important factors in Plaintiff Chapman's decision to purchase her vehicle. Before making her purchase, Plaintiff Chapman did an online search for the vehicle on Google, watched commercials for the vehicle on television, and visited the dealership's website. Moreover, before making her purchasing decision, Plaintiff Chapman test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Davis and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Chapman reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Chapman believed

that her 2017 Audi Q3 would be a safe and reliable vehicle.

47.     VW's omissions were material to Plaintiff Chapman. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, television ads, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Chapman would have seen and been aware of the disclosures. Furthermore, had she known of the Piston Defect, Plaintiff Chapman would not have purchased her vehicle, or would have paid less for it.

48.     Specifically, within weeks of her purchase, Plaintiff Chapman began to experience symptoms of the Piston Defect in that her vehicle was consuming excessive amounts of oil because the low oil light would illuminate within two weeks of her getting an oil change or adding oil to the vehicle.  The check engine light also illuminated.  The first time it occurred was a week and a half after she purchased the vehicle and she returned the vehicle to Atlanta Auto Brokers, who replaced oil level sensor in her vehicle.

49.     Two weeks later, both the low oil light and the check engine light illuminated again.  She presented her vehicle to Jim Ellis Audi, an authorized Audi dealership located in Marietta, Georgia.  She was informed that her vehicle was suffering from an internal oil leak related to the turbocharger and charged $4,000 for repairs, including a replaced turbocharger.

50.    This attempted repair did not remedy the Defect.  On April 8, 2021, Plaintiff Chapman returned her vehicle to Jim Ellis Audi because the low oil level light illuminated on her dashboard as well as the check engine light.  At that point, Jim Ellis Audi began an oil consumption test.

51.    After driving the vehicle for over 800 miles, the dealership confirmed that that Plaintiff Chapman's vehicle was consuming 3.11 quarts of oil per 1,000 miles of being driven.  Jim Ellis Audi contacted VWGoA's technical support line and opened a TAC case, number CT-766621.  The dealership was immediately directed by VWGoA to perform a borescope inspection of the cylinder bores to check for damage, to perform a compression leak down test, and a cylinder compression test.  The dealership reported the results of those tests to VWGoA's TAC and was told that the diagnosis is that all four pistons in the vehicle had to be replaced.  Plaintiff Chapman was quoted a price of $8,800 to replace the pistons in her vehicle and, because she cannot afford to pay this price, has lost the use of her vehicle.

52.    So far, Plaintiff Chapman has spent over $4,000 in diagnostics and unnecessary repairs to her vehicle at the direction of the Audi dealership, including a new turbocharger.

53.    However, Plaintiff Chapman's vehicle continues to exhibit the Piston Defect, and has never been repaired by VW despite a repair attempt and VWGoA

diagnosing the vehicle itself as having defective pistons.

54.     At all times, Plaintiff Chapman's, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, Plaintiff Chapman has properly maintained her vehicle.

55.     Although Plaintiff Chapman is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Cassie Vassel**

56.     Plaintiff Carrie Vassel is an Illinois citizen who is domiciled in Lynwood, Illinois.

57.     On or around October 28, 2020, Plaintiff Vassel purchased a used 2012 Audi Q5 equipped with the subject 2.0T Engine, from Rizza Auto Group located in Orland Park, Illinois. At the time of her purchase, the vehicle had approximately 58,000 miles on the odometer. She also purchased mechanical breakdown insurance from a third-party provider.

58.     Plaintiff Vassel purchased her vehicle primarily for personal, family, or household use.

59.     Passenger safety and reliability were important factors in Plaintiff

Vassel's decision to purchase her vehicle. Before making her purchase, Plaintiff Vassel did an online search for the vehicle on Google and visited the dealership's website, where she viewed the CarFax for the vehicle she ended up buying. Moreover, before making her purchasing decision, Plaintiff Vassel test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Vassel and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Vassel reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Vassel believed that her 2012 Audi Q5 would be a safe and reliable vehicle.

60.    VW's omissions were material to Plaintiff Vassel. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Vassel would have seen and been aware of the disclosures. Furthermore, had she known of the Piston Defect, Plaintiff Vassel would not have purchased her vehicle, or would have paid less for it.

61.    Specifically, within two weeks of her purchase, with approximately 59,000 miles on the odometer of her Audi Q5, Plaintiff Vassel had the oil changed in her vehicle.  Shortly thereafter, after she had driven approximately 800 miles,

the low oil level light illuminated in her vehicle.  She contacted the dealership where purchased her vehicle and they informed her that they changed the oil right before her purchase.  She added more oil to the vehicle at that time.

62.    After approximately 800 miles, the oil light illuminated again. Plaintiff Vassel contacted VWGoA in or around March 29, 2021 via telephone to complain about the oil consumption in her vehicle.  The representative, a brand ambassador for Audi named Cassidy Y., acknowledged that there was an ongoing issue with oil consumption in certain vehicles and the pistons were involved.  The representative advised her to take the vehicle to an Audi dealer for a diagnosis.  Her Audi Talk case number was 04716654.

63.    Plaintiff Vassel took her vehicle to Team Audi, an authorized Audi dealership located in Merrillville, Indiana, for diagnosis and repair.  Team Audi performed an oil consumption test.  On April 7, 2021, Team Audi diagnosed her vehicle as needing new pistons, piston rings, and all other associated hardware. She was told by the representative of Team Audi that this was a defect for her year and model of the vehicle and she would have to pay for it herself.  The estimate for the repair was $6,105.74.  The Audi service technician, Joe Brucemi, confirmed that this was ongoing issue with certain model year Audis, including his own vehicle.

64.    Plaintiff Vassel contacted her third-party mechanical breakdown

insurer to pay for any repairs needed prior to going to Team Audi to find out what information they would need to cover the repairs.  She provided that information to Team Audi, who was in direct contact with the insurance company subsequently. The warranty company required another oil consumption test, and then an engine teardown, which Team Audi advised she would have to pay for at a cost approximately $4,000.   The insurance company wanted to see evidence of an oil leak as opposed to a manufacturer's defect, which would not be covered.

65.     Because she cannot afford to repair her vehicle and due to her concern for her safety in the vehicle, Plaintiff Vassel has lost of the use of her vehicle.

66.     Plaintiff Vassel's vehicle continues to exhibit the Piston Defect and has never been repaired by VW.

67.     At all times, Plaintiff Vassel, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used.  She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, Plaintiff Vassel has properly maintained her vehicle.

68.     Although Plaintiff Vassel is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Karen Burnaugh**

20

69.     Plaintiff Karen Burnaugh is a Tennessee citizen who is domiciled in Knoxville, Tennessee.

70.     On or about May 28, 2012, Plaintiff Burnaugh purchased a new 2012 Audi A4 equipped with the subject 2.0T Engine, from Audi New Orleans, an authorized Audi dealer in Metairie, Louisiana.  At the time of her purchase, she also purchased an extended service plan through Audi Care.

71.     Plaintiff Burnaugh purchased her vehicle primarily for personal, family, or household use.

72.     Passenger safety and reliability were important factors in Plaintiff Burnaugh's decision to purchase her vehicle. Before making her purchase, Plaintiff Burnaugh spent several months researching her vehicle, during which time she visited the Audi website, spoke with a salesperson at Audi New Orleans, and looked over the vehicles on the lot at Audi New Orleans, including their Monroney Stickers.  Plaintiff Burnaugh test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Burnaugh and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Burnaugh reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Burnaugh believed that her 2012 Audi A4

would be a safe and reliable vehicle.

73.    VW's omissions were material to Plaintiff Burnaugh. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Burnaugh would have seen and been aware of the disclosures. Furthermore, had she known of the Piston Defect, Plaintiff Burnaugh would not have purchased her vehicle, or would have paid less for it.

74.    Specifically, on or around February 17, 2020, when her vehicle had approximately 58,663 miles on the odometer, the vehicle's low oil light illuminated, and she had to add a quart of oil between oil changes.  She took her vehicle to Audi New Orleans and asked for them to perform a check of the timing chain in the vehicle.  They recommended she replace the upper and lower timing cover gaskets, at a cost of $1,057.  She paid for the repairs and was told that she should only need to add oil every 3,000 to 5,000 miles.  She was also advised to call the dealership if she had to add more oil than that.

75.    This attempted repair did not fix the Piston Defect in Plaintiff Burnaugh's vehicle.  On or around November 6, 2020, Plaintiff Burnaugh took her vehicle to Audi Knoxville, an authorized Audi dealership located in Knoxville, Tennessee, for the vehicle's scheduled 65,000 service.  The oil was changed at that time.

76.    In December 2020, Plaintiff Burnaugh checked the Multi Media Interface ("MMI") to check on the vehicle's systems.  The MMI advised that the oil in her vehicle was low.  Plaintiff Burnaugh consulted the owner's manual for her vehicle to see what to do about the message and added a quart of oil, per the instructions in the manual.  She also took her vehicle to Audi Knoxville to ask about this message.  A technician told her that "this was not out of the ordinary" for her vehicle, but that she should wait to add a quart until the low oil light on the dashboard illuminated instead of relying on the MMI.  Subsequently, she researched complaints of oil consumption in her vehicle and read messages on owners' internet boards that Audi dealerships would not recommend that the oil consumption test be performed until the consumption was very severe.

77.    In January, February, and March of 2021, Plaintiff Burnaugh continued to monitor the oil level in her vehicle via the MMI and added a quarter approximately every 500 miles when the vehicle indicated that the oil level was low.  In April 2021, she returned her vehicle to Audi Knoxville and asked if the oil consumption in her vehicle was related to the timing chain defect that was the subject of a previous class action suit.  Audi Knoxville confirmed that her vehicle was a part of the previous timing chain defect class by checking the VIN of her vehicle, but said "a timing chain won't cause oil consumption."  Instead, the technician advised that "we have seen a lot of cars with the piston problem, this

was common…and possibly caused by faulty piston and rings… which costs about $6,000 to repair." She was further advised that she can buy a lot of oil with $6,000.

78.   Plaintiff Burnaugh had a dipstick installed in her vehicle in May 2021, to help her better keep track of the vehicle's oil consumption at a cost of $20 because she feels she cannot rely solely on the vehicle to inform her of its need for oil. Since that time, Plaintiff Burnaugh has monitored the oil level in her vehicle via the MMI and the dipstick. Her vehicle is now consuming a quarter and a half every 650 miles.

79.   So far, Plaintiff Burnaugh has spent well over $1,000 in diagnostics and repairs to her vehicle and hundreds of dollars to add inordinate amounts of oil to the vehicle but has not received an actual repair for the Piston Defect.

80.   Plaintiff Burnaugh's vehicle continues to exhibit the Piston Defect, continues to excessively consume oil, and has never been repaired by VW.

81.   At all times, Plaintiff Burnaugh, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, Plaintiff Burnaugh has properly maintained her vehicle, following the maintenance schedule published by VWGoA.

82.   Although Plaintiff Burnaugh is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's

advertising for or labeling of the vehicles.

**Plaintiff Tom Garden**

83.   Plaintiff Tom Garden is a Minnesota citizen who is domiciled in Edina located in Hennepin County, Minnesota.

84.   On or around April 16, 2014, Plaintiff Garden purchased a new 2014 Audi Q5 equipped with the subject 2.0T Engine, from St. Paul Audi, an authorized Audi dealer in Maplewood, Minnesota.

85.   Plaintiff Garden purchased his vehicle primarily for personal, family, or household use.

86.   Passenger safety and reliability were important factors in Plaintiff Garden's decision to purchase his vehicle. Before making his purchase, Plaintiff Garden did an online search for the vehicle on Google.  He specifically read the U.S. News and World Report ranking of the Q5 as the best subcompact sport utility vehicle.  He also read Kelley Blue Book and Car and Driver reviews and visited the dealership's website.  Plaintiff Garden test drove the vehicle he ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Garden and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Garden reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants

made no reference to the Piston Defect. Plaintiff Garden believed that his 2014 Audi Q5 would be a safe and reliable vehicle.

87.     VW's omissions were material to Plaintiff Garden. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, third party reviews and news articles, the Monroney sticker or through dealership personnel before he purchased his vehicle, Plaintiff Garden would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Garden would not have purchased his vehicle, or would have paid less for it.

88.     Specifically, on or around October 14, 2019, Plaintiff Garden has just taken his vehicle to Audi Richfield, an authorized Audi dealership located in Richfield, Minnesota, for service including an inspection. His vehicle had approximately 55,000 miles on the odometer at time and the vehicle's low oil light had begun to illuminate every 500 to 600 miles.  Audi Richfield performed repairs to the CV boot and the steering shaft, but did not attempt to repair the engine.

89.     Plaintiff Garden's vehicle subsequently continued to consume oil and the low oil light illuminated every 500 miles.  On or about May 30, 2020, Plaintiff Garden returned his vehicle to Audi Richfield and ask the dealership to check for possible causes of this problem.  At the time, his vehicle had approximately 60,300 miles on the odometer.   Audi Richfield informed him there was an oil leak,

specifically from the upper timing chain cover.  The dealership's quote for repair, of well over $1,000, was too expensive, and so he took his vehicle to an independent mechanic on or about June 17, 2020. The independent mechanic inspected Plaintiff Garden's vehicle and changed the timing chain cover gasket for approximately $287.09.  However, this repair failed to reduce the oil consumption in Plaintiff Garden's vehicle.

90.    On or about July 29, 2020, Plaintiff Garden returned his vehicle to the independent mechanic, who advised that it could be an issue with his oil level sensor.  At the time, Plaintiff Garden did not receive a repair to his vehicle.

91.    The oil consumption in Plaintiff Garden's vehicle got progressively worse.  On or about April 21, 2021, Plaintiff Garden took the vehicle again to the independent mechanic who informed him that they had seen a lot of Audi vehicles with this issue and that it was likely an engine problem caused by defective pistons. The independent mechanic further advised that they could replace the oil level sensor, to see if it was malfunctioning, as a first step.  Plaintiff Garden agreed to replace the oil level sensor and paid $313.14 for an oil change and a new oil level sensor.

92.    This failed to repair the Piston Defect and the excessive oil consumption continued in his vehicle.  On or about June 8, 2021, the independent mechanic quoted Plaintiff Garden $8,020.94 to replace the damaged engine with a

used engine.

93.     So far, Plaintiff Garden has spent nearly $3,000 in diagnostics and repairs to his vehicle, as well as paying for the oil his vehicle has been consuming, but has not received an actual repair for the Piston Defect.

94.     Plaintiff Garden's vehicle continues to exhibit the Piston Defect, continues to excessively consume oil, and has never been repaired by VW. Because of the Piston Defect, Plaintiff Garden does not drive the vehicle long distances.

95.     At all times, Plaintiff Garden, like all Class Members, attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used. He has not used the vehicle for drag racing or off-roading or any other atypical mode of driving.  At all times, Plaintiff Garden has properly maintained his vehicle, following the maintenance schedule published by VWGoA.

96.     Although Plaintiff Garden is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiffs Ada and Angeli Gozon**

97.     Plaintiff Ada and Angeli Gozon are Nevada citizens who are domiciled in Las Vegas, Nevada.

98.     On or around April 25, 2013, Plaintiffs Ada and Angeli Gozon

purchased a new 2013 Audi A4 equipped with the subject 2.0T Engine, from Audi Las Vegas, an authorized Audi dealer in Las Vegas, Nevada.

99.     Plaintiffs Ada and Angeli Gozon purchased their vehicle primarily for personal, family, or household use.

100.   Passenger safety and reliability were important factors in Plaintiffs Ada and Angeli Gozon's decision to purchase their vehicle. Before making their purchase, Angeli Gozon viewed the dealership's website and they test drove a vehicle of the same model and year as the one they ended up buying with an authorized dealership salesperson. During the test drive, the Gozons and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiffs Ada and Angeli Gozon reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect.  The vehicle Plaintiffs Ada and Angeli Gozon was identical to the vehicle they test drove except for the color and some interior wood paneling. Plaintiffs Ada and Angeli Gozon believed that their 2013 Audi A4 would be a safe and reliable vehicle.

101.   VW's omissions were material to Plaintiffs Ada and Angeli Gozon. Had VW disclosed its knowledge of the Piston Defect including in or on any media including through the dealership salesperson or on the Monroney Sticker before

they purchased their vehicle, Plaintiffs Ada and Angeli Gozon would have seen and been aware of the disclosures. Furthermore, had they known of the Piston Defect, Plaintiffs Ada and Angeli Gozon would not have purchased their vehicle, or would have paid less for it.

102.   Plaintiff Angeli Gozon experienced mechanical issues with the vehicle related to the Piston Defect. Specifically, in or around May 2019, Angeli Gozon was driving their vehicle when it began to shake and lose power.   In addition, the check engine light illuminated.  She managed to get the vehicle to the closest AutoZone store safely.  The store clerk checked for Diagnostic Trouble Codes ("DTCs") and found codes for cylinder misfire, specifically P0304.

103.   On or about May 16, 2019, Angeli Gozon drove the vehicle to Audi Las Vegas.  There, the technician at the dealership verified that the vehicle had a misfire on cylinder 4 and had a loss of compression. The vehicle was diagnosed as having piston failure and Audi Las Vegas recommended replacement at the cost of $5081.81.

104.   Unable to afford this, Plaintiffs Ada and Angeli Gozon took the vehicle to an independent mechanic, who verified that the pistons and piston rings needed to be replaced and quoted $2,600 for the repair.  Because this was significantly less expensive than the dealership quote, the Gozons agreed. However, because the replaced pistons and piston rings are identical to the ones

that failed, this failed to repair the Piston Defect.

105.   Plaintiff Ada and Angeli Gozon's vehicle continues to exhibit the Piston Defect in that has never been repaired by VW.  The Gozons were without their vehicle for a month as a result of the Piston Defect and fear they will lose use of the vehicle again due to the Piston Defect.

106.   At all times, Plaintiffs Ada and Angeli Gozon, like all Class Members, attempted to drive their vehicle in a manner both foreseeable and in which it was intended to be used. They have not used the vehicle for drag racing or off-roading or any other atypical mode of driving.  At all times, Plaintiffs Ada and Angeli Gozon have properly maintained the vehicle, including following the maintenance schedules published by VWGoA.

107.   Although  Plaintiffs  Ada  and  Angeli  Gozon  are  interested  in purchasing another Class Vehicle in the future, they will not do so because they will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Hernan A. Gonzalez**

108.   Plaintiff Gonzalez is a New Jersey citizen who is domiciled in Bergenfield, New Jersey.

109.   On or around November 15, 2014, Plaintiff Gonzalez purchased a new 2015  Q5  from  Audi  Englewood,  an  Audi  authorized  dealership,  located  in Englewood, New Jersey.

110.   Plaintiff Gonzalez purchased his vehicle primarily for personal, family, or household use.

111.   Passenger safety and reliability were important factors in Plaintiff Gonzalez's decision to purchase his vehicle. Before making his purchase, Plaintiff Gonzalez did an online search for the vehicle on Google. He visited Audi's website, as well as the dealership's website, to research the 2015 Audi and its 2.0T engines. Moreover, before making his purchasing decision, Plaintiff Gonzalez test drove the vehicle he ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Gonzalez reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Gonzalez believed that his 2015 Audi would be a safe and reliable vehicle.

112.   VW's omissions were material to Plaintiff Gonzalez. Had VW disclosed its knowledge of the Piston Defect before he purchased his vehicle, Plaintiff Gonzalez would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Gonzalez would not have purchased his vehicle, or would have paid less for it.

113.   In or around March 2021, with approximately 26,000 miles on the

odometer, Plaintiff noticed his vehicle was excessively consuming oil and losing power while driving.  On or about May 20, 2021, the check engine light illuminated in Plaintiff's vehicle and Plaintiff brought his vehicle to Audi Englewood.  The dealership diagnosed the issue as piston failure and recommended replacement of four pistons.  Specifically, the dealership found faults for misfires in two cylinders, number 2 and 4, and found the same faults remained after swapping the coils and spark plug.  The dealership then discovered that one cylinder had no compression and was cracked.  Plaintiff Gonzalez was charged over $7500.00 for the repairs.

114.   The photographs below show the four pistons which were removed from Plaintiff's vehicle.





115.   Plaintiff Gonzalez's vehicle remains subject to the Piston Defect because the replacement parts also suffer from the inherent defect, having been sourced from VWGoA.

116.   At all times, Plaintiff Gonzalez, like all Class Members, attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used, in the sense that he has driven it like a typical consumer and not used it for drag racing, for example.  At all times, Plaintiff Gonzalez has properly maintained his vehicle, bringing it exclusively to Audi authorized dealers for service.

117.   Although Plaintiff Gonzalez is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Patricia A. Hensley**

118.   Plaintiff Patricia A. Hensley is a New York citizen who is domiciled in East Amherst, New York.

119.   On or around May 25, 2016, Plaintiff Hensley purchased a used 2015 Audi A3 Cabriolet equipped with the subject 2.0T Engine, from Eimports4less, located in Perkasie, Pennsylvania.  At the time of her purchase, the vehicle had approximately 9,209 miles on the odometer.

120.   Plaintiff Hensley purchased her vehicle primarily for personal, family,

or household use.

121.   Passenger safety and reliability were important factors in Plaintiff Hensley's decision to purchase her vehicle. Before making her purchase, Plaintiff Hensley did an online search for the vehicle on Google, read reviews from Car and Driver, Kelley Bluebook, and Edmunds, and visited Audi's website and the dealership's website.  Prior to purchasing her vehicle, Plaintiff Hensley test drove an A5 Cabriolet from Audi Buffalo, an authorized Audi dealership located in Bowmansville, New York. After the test drive, Plaintiff Hensley and a salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Hensley reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Hensley believed that her 2015 Audi A3 would be a safe and reliable vehicle.

122.   VW's omissions were material to Plaintiff Hensley. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, third party reviews and news articles, owners forums, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Hensley would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Hensley would not have

purchased her vehicle.

123.  On or around July 28, 2021, Plaintiff Hensley's vehicle began to display symptoms of the Piston Defect.  Specifically, while Plaintiff Hensley was driving, the vehicle went into limp mode, lost power steering, and the engine blew without prior warning.  At the time, her vehicle had approximately 55,000 miles on the odometer.  Plaintiff Hensley's vehicle was towed to Audi Buffalo.

124.  On or around July 30, 2021, Audi Buffalo inspected the vehicle in order to diagnose the issue and found a misfire on cylinder 2.  The dealership also performed a compression test and found that cylinder two had only 25 PSI, and further, discovered pieces of the piston in the oil pan and inside the oil sump.  As a result, Audi Buffalo diagnosed the vehicle as having piston failure.

125.  While repairing the vehicle, Audi Buffalo contacted VWGoA regarding the repairs to Plaintiff Hensley's vehicle, and VWGoA agreed to cover 25% of the cost of the engine replacement.  Subsequently, on or about August 24, 2021, Plaintiff Hensley contacted VWGoA, requesting reconsideration of the amount of the repair it would cover.  Approximately a week later, a VWGoA representative contacted Plaintiff Hensley and advised that VWoA was not willing to reimburse her beyond the 25% of the cost it already provided.  Plaintiff Hensley then asked to speak with a supervisor who contacted her a few days later, and said VWGoA could not provide any additional assistance because she was not a "loyal

customer". Accordingly, because of the Piston Defect, Plaintiff Hensley had to pay approximately $5,600 to have her engine replaced.

126. The photographs below show pieces of the pistons in the oil pan and oil sump of Plaintiff Hensley's engine:





127. Plaintiff Hensley's vehicle remains subject to the Piston Defect because the replacement parts also suffer from the inherent defect, having been

sourced from VWGoA.

128.   At all times, Plaintiff Hensley, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, she has properly maintained the vehicle, including following the maintenance schedules published by VWGoA.

129.   Although Plaintiff Hensley is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Clydiene Francis**

130.   Plaintiff Clydiene Francis is a Pennsylvania citizen who is domiciled in Lewisberry, Pennsylvania.

131.   On or about August 22, 2020, Plaintiff Francis purchased a used 2012 Audi A4 equipped with the subject 2.0T Engine, from Faulkner Toyota, located in Harrisburg, Pennsylvania.

132.   Plaintiff Francis purchased her vehicle primarily for personal, family, or household use.

133.   Passenger safety and reliability were important factors in Plaintiff Francis's decision to purchase her vehicle. Before making her purchase, Plaintiff Francis did an online search for the vehicle on Google, reading an owners 'forum,

as well as Kelley Blue Book and Edmunds reviews.  She also visited the dealership's website.  Plaintiff Francis test drove the vehicle she ended up buying with an authorized dealership salesperson. During the test drive, Plaintiff Francis and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Francis reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Francis believed that her 2012 Audi A4 would be a safe and reliable vehicle.

134.    VW's omissions were material to Plaintiff Francis. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, third party reviews and news articles, owners forums, the Monroney sticker or through dealership personnel before she purchased her vehicle, Plaintiff Francis would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Francis would not have purchased her vehicle, or would have paid less for it.

135.    Within a month of her purchase, in September 2020, Plaintiff Francis's vehicle began to display symptoms of the Piston Defect.  Specifically, the low oil light illuminated and she had to add oil to the engine.  In October 2020, she had the oil changed in the vehicle.  Shortly thereafter, in November 2020, when

the low oil light illuminated again, she contacted Audi Mechanicsburg, an authorized Audi dealership located in Mechanicsburg, Pennsylvania, for diagnosis. She was told that it was normal for her vehicle to consume oil and that if she were worried, she should bring it for an oil consumption test.

136.   On January 15, 2021, she took the vehicle to Audi Mechanicsburg, and complained about the oil consumption.  She was immediately advised by a service technician that it sounded like a piston problem and she would need a full replacement of the pistons.  At that time, the vehicle received an oil change and the first part of the oil consumption test was started.

137.   Four days later, Plaintiff Francis then contacted VWGoA d/b/a Audi of America Inc. via telephone, because the oil light illuminated again.  She was told by a VWGoA representative that she would need to have her vehicle put through an oil consumption test, which she had already begun.  This is a two-part test during which at least 2,000 miles must be driven on the vehicle.

138.   Between January 19, 2021 and April 14, 2021, she was in contact with the VWGoA representative approximately eight times as they exchanged calls. The representative for VWGoA made representations to her that the problem with her vehicle was familiar the company, but that the oil consumption test was needed to get any assistance from Audi of America.  On April 14, 2021, the VWGoA said that the oil consumption test had to be restarted because of the time that had elapsed

and because Plaintiff Francis had added oil since the light was coming on so frequently.

139.  Audi Mechanicsburg began the oil consumption test again on or about April 19, 2021.

140.  On or about May 6, 2021, Audi Mechanicsburg confirmed that her vehicle was consuming oil at a rate of 1.9 quarts per 1,000 miles driven and that there was a 8-10% cylinder leakage on each cylinder.  Audi Mechanicsburg contacted VWGoA and opened a TAC case, access code 2771002.  VWGoA immediately recommended a total piston replacement and denied Plaintiff Francis' request for assistance in paying for the repairs due to the model year of her vehicle. At the time, her vehicle had approximately 82,000 miles on the odometer.

141. So far, Plaintiff Francis has spent $600 in diagnostics to Audi Mechanicsburg and hundreds of dollars in additional oil for her vehicle, but has not received an actual repair for the Piston Defect because of the cost.

142.  Plaintiff Francis's vehicle continues to exhibit the Piston Defect, continues to excessively consume oil, and has never been repaired by VW. Because of the Piston Defect, Plaintiff Francis must continually purchase additional oil and fill the engine between oil changes.

143.  At all times, Plaintiff Francis, like all Class Members, attempted to drive her vehicle in a manner both foreseeable and in which it was intended to be

used. She has not used the vehicle for drag racing or off-roading or any other atypical mode of driving. At all times, she has properly maintained the vehicle, including following the maintenance schedules published by VWGoA.

144.   Although Plaintiff Francis is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiffs Peter and Gunnel Lowegard**

145.   Plaintiffs Peter and Gunnel Lowegard are Texas citizens who are domiciled in Richardson, Texas.

146.   On or around June 7, 2013, Plaintiffs Peter and Gunnel Lowegard purchased a new 2013 Audi Q5 equipped with the subject 2.0T Engine, from Audi Plano, an authorized Audi dealer in Plano, Texas.

147.   Plaintiffs Peter and Gunnel Lowegard purchased their vehicle primarily for personal, family, or household use.

148.   Passenger safety and reliability were important factors in Plaintiffs Peter and Gunnel Lowegard's decision to purchase their vehicle. Before making their purchase, Plaintiff Peter and Gunnel Lowegard visited several luxury car dealerships, including Audi Plano, where they reviewed vehicle brochures and window stickers.  Plaintiffs Peter and Gunnel Lowegard test drove the vehicle they ended up buying with an authorized dealership salesperson. During the test drive,

Plaintiff Peter and Gunnel Lowegard and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. Also, before purchase, Plaintiff Peter and Gunnel Lowegard reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiffs Peter and Gunnel Lowegard believed that their 2013 Audi Q5 would be a safe and reliable vehicle.

149.   VW's omissions were material to Plaintiffs Peter and Gunnel Lowegard. Had VW disclosed its knowledge of the Piston Defect including in or on any media including the vehicle brochure, the Monroney sticker or through dealership personnel before they purchased their vehicle, Plaintiffs Peter and Gunnel Lowegard would have seen and been aware of the disclosures. Furthermore, had they known of the Piston Defect, Plaintiffs Peter and Gunnel Lowegard would not have purchased their vehicle, or would have paid less for it.

150.   Specifically, on or around April 29, 2021, Plaintiffs Peter and Gunnel Lowegard picked up their vehicle from Audi Plano where it had just been serviced. While driving the vehicle home, the check engine light illuminated and Plaintiffs Peter and Gunnel Lowegard immediately returned their vehicle to Audi Plano.  In addition to diagnosing that the turbocharger needed to be replaced, Audi Plano found that there were misfires on cylinders 2 and 4, no compression at all on

cylinder 4, and that there was cylinder wall scoring from defective pistons.  Audi Plano recommended a long block replacement, which includes the pistons and piston rings. At the time of diagnosis, the vehicle had 70,924 miles on the odometer.

151.   Despite having properly maintained their vehicle and following the maintenance schedule provided by VWGoA, Plaintiffs Peter and Gunnel Lowegard were charged $12,316.86 for the long block replacement necessitated by the damage the Piston Defect caused to their vehicle's engine.

152.   At all times, Plaintiffs Peter and Gunnel Lowegard, like all Class Members, attempted to drive their vehicle in a manner both foreseeable and in which it was intended to be used. They have not used the vehicle for drag racing or off-roading or any other atypical mode of driving.  At all times, Plaintiffs Peter and Gunnel Lowegard properly maintained their vehicle, following the maintenance schedule published by VWGoA.

153.   Although Plaintiffs Peter and Gunnel Lowegard are interested in purchasing another Class Vehicle in the future, they will not do so because they will be unable to rely on VW's advertising for or labeling of the vehicles.

**Plaintiff Grant Bradley**

154.   Plaintiff Grant Bradley is a Washington citizen who is domiciled in Vancouver, Washington. Vancouver, Washington sits on the border between

Washington and Oregon.

155.   On or around March 23, 2012, Plaintiff Bradley purchased a new 2012 Audi A4 Avant equipped with the subject 2.0T Engine, from Audi Beaverton, an authorized Audi dealer in Beaverton, Oregon.  Audi Beaverton regularly advertises its services to Washington residents, because it is within 20 miles of the Washington and Oregon border.   In fact, the front page of Audi Beaverton's website proudly notes that, "Audi Beaverton provides the highest quality new Audi, Certified  pre-owned Audi  vehicles and used  cars for  drivers  in Portland, Beaverton, Lake Oswego, Camas, Vancouver, WA…"[4]

156.   Plaintiff Bradley paid Washington state sales tax on his vehicle purchase and the vehicle has always been registered in Washington state.  Each year, his inspection and emissions testing has been completed to Washington state specifications.

157.   Plaintiff Bradley purchased his vehicle primarily for personal, family, or household use.

158.   Passenger safety and reliability were important factors in Plaintiff Bradley's decision to purchase his vehicle. Before making his purchase, Plaintiff Bradley visited the dealership's website.  Plaintiff Bradley test drove the vehicle he ended up buying with an authorized dealership salesperson. During the test

---

[4] *See* https://www.audibeaverton.com/ (last visited July 15, 2021).

drive, Plaintiff Bradley and the salesperson discussed the vehicle, and the salesperson made no mention of the Piston Defect. However, immediately after he purchased the vehicle, the salesperson warned him to "watch the oil level, these vehicles like oil." Also, before purchase, Plaintiff Bradley reviewed the vehicle's Monroney Sticker or "window sticker" which listed official information about the vehicle. Like the other sources, in the Monroney Sticker, Defendants made no reference to the Piston Defect. Plaintiff Bradley believed that his 2012 Audi A4 Avant would be a safe and reliable vehicle.

159. VW's omissions were material to Plaintiff Bradley. Had VW disclosed its knowledge of the Piston Defect including in or on any media including internet sites and ads, the Monroney sticker or through dealership personnel before he purchased his vehicle, Plaintiff Bradley would have seen and been aware of the disclosures. Furthermore, had he known of the Piston Defect, Plaintiff Bradley would not have purchased his vehicle, or would have paid less for it.

160. Specifically, in or around in the fall of 2015, Plaintiff Bradley noticed that his vehicle was consuming excessive amounts of oil in that it needed significant quantities of oil between oil changes. When the low oil light was coming on frequently and he would take his vehicle to Audi Service Portland, authorized Audi dealership located in Portland, Oregon. Audi Service Portland also advertises its vehicles and services in the Vancouver, Washington area. Audi

Service Portland would top off the oil in his vehicle, but did not perform a repair and did not advise of the Piston Defect. At the time, his vehicle had approximately 40,000 miles on the odometer.

161.   Plaintiff Bradley would periodically complain about the excessive oil consumption when bringing in his vehicle for service at Audi Service Portland but was repeatedly told that was normal for his vehicle.

162.   By October 21, 2019, the Piston Defect in his vehicle had progressed to where his vehicle was consuming a quart of oil every 500 miles of being driven. He returned his vehicle to Audi Service Portland, which suggested that it sounded like his vehicle's engine needed the piston rings replaced.  However, rather than replacing the pistons or the rings, Audi Service Portland ran the two-part VWGoA-mandated oil consumption test on his vehicle.   At the time, his vehicle had approximately 55,000 miles on the odometer.

163.   On November 11, 2019, Audi Service Portland confirmed that Plaintiff Bradley's vehicle was excessively consuming oil and required a full piston replacement.  Plaintiff Bradley complained to Audi Service Portland, outraged that his pistons had begun failing at 40,000 miles, that its authorized dealership had repeatedly told him there was no problem while the warranty was in effect, and that the pistons were confirmed to have failed at 55,000 miles.  Audi Service Portland informed VWGoA of the situation and VWGoA paid for half the cost of

the piston replacement and Plaintiff Bradley had to pay $3,346 out of pocket.  On the repair order paperwork, VWGoA noted that this was a goodwill repair and was not a defect caused by material or workmanship and is not covered under warranty.

164.   So far, Plaintiff Bradley has spent thousands in diagnostics and repairs to his vehicle.

165.   Plaintiff Bradley's vehicle currently has 64,000 miles on the odometer.

166.   At all times, Plaintiff Bradley, like all Class Members, attempted to drive his vehicle in a manner both foreseeable and in which it was intended to be used. He has not used the vehicle for drag racing or off-roading or any other atypical mode of driving.  At all times, Plaintiff Bradley maintained his vehicle according to the maintenance guidelines published by VWGoA.

167.   Although Plaintiff Bradley is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on VW's advertising for or labeling of the vehicles.

**<u>Defendants</u>**

168.   Defendant VWGoA is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Porsche Drive, Herndon, Virginia 20171. At this facility, VWGoA coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and

Lamborghini brands, as well as the activities of its 8,000 employees and its subsidiary, VW Credit, Inc.  One of VWGoA's fictious names is Audi of America, Inc., which it has registered with the Virginia Secretary of State.

169.   Defendant VWGoA, through its various entities, markets, distributes, warranties, and sells Volkswagen and Audi-branded automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States, including New Jersey and California, Florida, Georgia, Illinois, Louisiana, Minnesota, Nevada, Pennsylvania, Texas, and Washington.

170.   In order to sell vehicles to the general public, VWGoA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Volkswagen and/or Audi-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to VWGoA, Audi AG, and VWAG instructions, issued through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents. Per the agreements between VWGoA and the authorized dealers, consumers such Plaintiffs are able to receive services under VWGoA's issued warranty at dealer locations that are convenient to them. These agreements provide VWGoA with a significant amount of control

over the actions of the authorized dealerships, of which there are nearly 1,000 in the United States.

171.    VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA also is responsible for the content of the Monroney Stickers on Volkswagen and Audi-branded vehicles.

172.    Defendant Volkswagen AG is an entity incorporated in and registered to do business in Germany with its principal place of business at Berliner Ring 2, 38440, Wolfsburg, Germany. This facility also encompasses a 70 million sq. ft. manufacturing facility, the Wolfsburg Volkswagen Plant, where over 800,000 vehicles are produced each year. The Wolfsburg headquarters also have individual production facilities, specialty production plants, warehouses, and administration buildings, with over 20,000 employees. VWAG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Volkswagen, Skoda, and Audi-branded vehicles and parts for those vehicles worldwide, including the in the United States.

173.    VWAG is the parent corporation of VWGoA and Audi AG, which are each wholly owned subsidiaries. VWAG is also the parent corporation of the United States manufacturing facilities for Volkswagen and Audi-branded vehicles. For all its United States subsidiaries, including VWGoA, VWAG and/or Audi AG

provide all the technical and information for the purpose of manufacturing, servicing, and repairing the Class Vehicles. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity.  Discovery will also show that VWAG made the decision to move VWGoA's headquarters to Virginia.

174.   Defendant Audi AG is an entity incorporated and registered in Germany with its principal place of business at Auto-Union-Str. 2 D-85045, Ingolstadt, Germany. The Ingolstadt facility encompasses both corporate offices which coordinate and supervise its worldwide operations, and a factory which produces over 300,000 vehicles a year, totaling over 30 million sq. ft.  As of the end of 2020, over 43,000 employees worked at this facility.  Audi AG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

175.   The relationship between VWAG and VWGoA is governed by a General Distributor Agreement that gives Audi AG and/or VWAG the right to control nearly every aspect of VWGoA's operations related to both Volkswagen and Audi-branded vehicles—including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

176.   For all VWAG United States subsidiaries, including VWGoA, VWAG

and/or Audi AG provides all the technical and information for the purpose of servicing, and repairing the Class Vehicles, as well as the information needed to draft the owners' manuals.

177.   At all relevant times, VW was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in San Diego County and throughout the United States of America.

## JURISDICTION

178.   This is a class action.

179.   Plaintiffs and members of the proposed Class are citizens of states different from the home state of Defendants.

180.   The aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

181.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

## VENUE

182.   Defendants, through their business of distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this district such that personal jurisdiction is appropriate. As such, Defendants are deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

183.   In addition, a substantial part of the events or omissions giving rise to

these claims took place in this District because VWGoA is incorporated in this District.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

184.   For years, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. VW has sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in New Jersey and nationwide. VW warrants and services the Class Vehicles through its nationwide network of authorized dealers and service providers.

185.   The 2.0T Engine is a four-cylinder turbocharged engine, designated as the second generation EA888 by VW.  In production since 2008, the 2.0T Engine was different from the first generation EA888 in that it had low-friction thin piston rings and newly designed pistons.

186.   As with most internal combustion engines, the piston slides into the cylinder bore of an engine block, transferring the force from expanding gas in the cylinder to the crankshaft via the crankpin.  See Figure 1 below. Pistons, such as the ones in the 2.0T engine, are cast aluminum alloy pieces which conduct and transfer heat.  Because aluminum expands when heated, both the piston and the cylinder bore must be manufactured precisely so that the piston can move freely without allowing the force of the combusting gas to escape.

FIGURE 1



187.   The piston head is the top of the piston, closest to the cylinder head. Piston rings, which are settled into the piston grooves, seal the combustion chamber, transfer heat to the cylinder wall, and control oil consumption.  As with the piston itself, the piston rings must be manufactured to precise specifications, so that they can provide a radial fit between the cylinder wall and the piston.

188.   The Class Vehicles contain one or more design, manufacturing, and workmanship defects, including but not limited to defects wherein the pistons, piston rings, and/or piston heads cause the piston rings to fail to seat properly.  As

a result, these components cannot withstand the heat and pressure of the engine and crack, fracture, or splinter. See Figures 2 and 3 below.  One result of the Piston Defect is that the engine can consume excessive amounts of oil.  Furthermore, the damage to the piston causes immediate loss of compression within the engine cylinder and causes the remnants of the piston to circulate throughout the fuel system of the Class Vehicles, damaging other engine components.

FIGURE 2[5]



FIGURE 3[6]

[5] Humble Mechanic, "Catastrophic Piston Failure 2.0t TSI Engine ~ Walkthrough and Diagnosis," Aug. 7, 2019, https://www.youtube.com/watch?v=V6jzRQpMw24 (last visited April 19, 2021)

[6] Figure 3 shows two of the defective piston heads taken from Plaintiff Rieger's vehicle, along side a defective piston head taken from a Q5 with a 2.0T Engine which also suffered from the Piston Defect.

55



189.   VW acquired its knowledge of the Piston Defect within the 2.0T Engine through sources not available to Plaintiffs or Class Members, including but not limited to pre-release testing data, early consumer complaints about the Piston Defect to VW and its dealers about the Class Vehicles as well as other earlier model year versions of such vehicles, testing conducted in response to those complaints, aggregate data from VW's dealers, aggregate sales data of replacement piston rings, pistons, and engines, and from other internal sources.

190.   The 2.0T Engine, since its widespread release by VW in 2009, has proven to be nothing but problematic. Since its release, the 2.0T Engine has been subject to many complaints, including but not limited to excessive oil consumption and defective timing chains, both of which resulted in VW agreeing to extend its warranty for timing chain systems and reimburse persons affects by such defect.

Presently, the 2.0T Engine in the Class Vehicles has caused VW to become aware of the Piston Defect through many customers' complaints of loss of compression within an engine cylinder, metal shavings within the fuel system, and/or other forms of engine failure. All of these failures or sequelae of failures ultimately cause the catastrophic failure of the 2.0T Engine, the many of them before 75,000 miles. As such, many customers have had to completely replace their engines prematurely.

191.   Specifically, the 2.0T Engine's pistons/piston heads were defectively designed and/or manufactured to operate within the pressures and temperatures of the oil and fuel system, which in turn causes the piston rings and/or piston heads to crack, splinter, shatter, fracture, and/or break off into pieces within the engine cylinder. In turn, this causes loss of compression in one or more cylinders, triggering a "check engine light" for cylinder misfire due to loss of engine performance. Additionally, the pistons' constant engagement to tremendous forces and heat during normal engine operation will cause the piston head and/or piston rings to become faulty or fail, leading to excessive oil consumption, engine knock and/or pre-ignition, which can lead to undesirable pressure within the engine resulting in poor performance and engine damage, and oftentimes catastrophic damage.

**The Piston Defect Poses a Serious Safety Concern**

192.   As discussed supra, when a piston or piston suddenly and unexpectedly fail, the Class Vehicles immediately lose partial or total engine power.   When a vehicle loses partial engine power, it prevents the driver from accelerating or maintaining speed.   If a vehicle loses total engine power, it will stall, prevent the driver from being able to adequately control the steering wheel and/or engaging the brakes properly.   All of these situations drastically increase the risk of collisions, particularly at intersections and on highways.

### The Warranties Provided by VW for Audi-branded Vehicles

193.   VWGoA, under its business name of Audi of America, Inc., provides warranties directly to Plaintiffs and consumers.   This New Vehicle Limited Warranty covers "defects in manufacturer's material and workmanship," and is limited to "4 years or 50,000 miles from your vehicle's in-service date, which occurs first."   This coverage includes the piston rings, pistons, and the engine and its other components.

194.   Despite the fact that the New Vehicle Limited Warranty is provided by VWGoA, the copyright to the warranty terms is held by Audi AG.   As such, the warranty booklets provided to Plaintiffs and consumers by VWGoA are done so with the explicit permission of Audi AG.   Moreover, Audi AG is the author of the warranty terms.

195.   VWGoA also provides "Audi Certified pre-owned Limited Warranty"

to vehicles purchased as "certified pre-owned" from authorized Audi dealerships. This Certified Pre-Owned Warranty provides that "[i]f Audi New Vehicles Limited Warranty (NVLW) coverage remains at the time of Certified pre-owned (CPO) purchased, CPO Limited Warranty Coverage commences upon expiration of NVLW and continues until 5 years from vehicle's original in-service date with no mileage limitation.  If NVLW coverage has expired at time of CPO purchase, CPO Limited Warranty coverage continues for 12 months with no mileage limitation."

196.   The coverage terms of the CPO Limited Warranty are similar to the terms of the New Vehicle Limited Warranty.

197.   Unlike many car companies, VW does not make it owners' manuals and warranty booklets available online prior to purchase.  In order to access such materials on VW's websites, a consumer needs a Vehicle Identification Number. As such, the full warranty terms are presented to Plaintiffs and consumers after the purchase, on a take-it-or-leave-it basis.

**VW Had Superior and Exclusive Knowledge of the Piston Defect**

198.   Since 2012, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. Because VW has been making the 2.0T engine since 2008, VW was acutely aware of the 2.0T engine's defective pistons and piston rings that caused oil consumption well before the Class Vehicles were offered for sale on the market.

199.   VW had superior and exclusive knowledge of the Piston Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

200.   Well before Plaintiffs' purchases of their vehicles, VW knew about the Piston Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to VW and its dealers, testing conducted in response to those consumer complaints, high failure rates of the pistons within the 2.0T Engine, the data demonstrating the inordinately high volume of replacement part sales, and other aggregate data from VW dealers about the problem.

201.   VW is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale durability testing, on incoming components, including the pistons, to verify the parts are free from defect and align with VW's specifications.[7] Thus, VW knew or should have known the pistons within the 2.0T Engine were defective and prone to put drivers in a dangerous position due to the inherent risk of the Piston Defect.

---

[7] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed June 5, 2019).

202.   Specifically, VW's preproduction testing includes extensive road testing at its proving grounds in Ehra-Lessien, Germany.  There, testing includes materials testing for engine components and VW is known to be spend more for research and development than any other major vehicle manufacturer in the world and produces far more pre-production vehicles.[8]  In fact, VW even mistakenly sold nearly 7,000 pre-production models, which were meant to be destroyed, to consumers.[9]  The pre-production testing on the 2.0T engines revealed the Defect to VW.

203.   Additionally, Defendants should have learned of this widespread defect from the sheer number of reports received from dealerships. VW's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Piston Defect, which led to the release of the Technical Tips for its pre-2012 2.0T Engine. VW's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is

---

[8] Christiaan Hetzner, *Inside Volkswagen's secret Ehra-Lessien proving grounds*, AUTOWEEK.COM, https://www.autoweek.com/news/technology/a1828046/volkswagens-secret-ehra-lessien-proving-grounds/ (last viewed April 19, 2021).

[9] Kyle Hyatt, *VW sold at least 6,700 preproduction cars to consumers and that's not good*, CNET.com, https://www.cnet.com/roadshow/news/vw-preproduction-test-cars-sold-to-public/ (last viewed April 20, 2021)

being requested, parts sales reports, and warranty claims data.

204. VWGoA's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is VWGoA's policy that when a repair is made under warranty the dealership must provide VWGoA with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed. As a result of analyzing the requests for warranty repairs, Defendants would have learned about the ongoing nature of the Piston Defect.

205. Federal law requires automakers like VW to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

206. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential

defects in their vehicles, including those which are safety-related. *Id*. Thus, VW knew or should have known of the many complaints about the Piston Defect logged by NHTSA ODI. The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, VW to the Piston Defect in its 2.0T Engines as early as 2012.

207.   With respect solely to the Class Vehicles, the foregoing excerpts of owner incident reports are but a few examples of the many complaints concerning the Piston Defect which are available through NHTSA's website, www.NHTSA.gov. Many of the complaints reveal that VW, through its network of dealers and repair technicians, had been made aware of the Piston Defect. In addition, the complaints indicate that despite having knowledge of the Piston Defect and even armed with knowledge of the exact vehicles affected, VW often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty. When VW did attempt repairs, it merely replaced the defective pistons with similarly defective pistons.

208.   On September 15, 2015, a class vehicle driver reported the following incident dated September 15, 2015:[10]

> EXCESSIVE OIL CONSUMPTION. UNDER NORMAL
> DRIVING CONDITIONS, THE ENGINE LIGHT CAME ON
> TO ADD 1 QUART OF OIL 3,000 MILES BEFORE THE

---

[10]https://www.nhtsa.gov/vehicle/2015/AUDI/A4/4%252520DR/AWD#complaints

NEXT SERVICE INTERVAL. ONLY 22,000 MILES ON THE CAR.

209.   On October 13, 2014, a class vehicle driver reported the following incident dated August 14, 2014:[11]

> I GOT A LOW OIL WARNING WITH ONLY 2700 MILES ON THE CAR, AND THE OIL IS DARK AND DIRTY COMPARE TO THE LONER CAR I GOT.
> IT HAS BEEN THREE TIMES I BROUGHT MY CAR BACK TO THE SERVICE DEPARTMENT IN THE DEALER, BUT THEY NEVER SOLVED THE PROBLEM. FIRST TIME, THEY TOPED UP THE OIL. AFTER TWO WEEKS, THE OIL WAS LOW AGAIN, SO I BROUGHT IT BACK. THIS TIME, THEY CHANGED A NEW OIL TANK CAP FOR ME, BUT TWO WEEKS LATER, THE OIL WAS LOW. I DROVE IT BACK TO THE SERVICE, THIS TIME ACTUALLY THE AUDI COMPANY TOLD ME THAT IS BECAUSE MY CAR IS STILL IN BREAK-IN PERIOD AND JUST TOPPED UP THE OIL AGAIN. BUT AS AN ENGINEER, I KNOW IT CANNOT BE 2 QT PER 1000 MILES.

210.   On April 6, 2018, a class vehicle driver reported the following incident dated March 5, 2018:

> LOST COMPRESSION AT ONLY 43,670 MILES TO FOURTH CYLINDER. ENGINE WAS REBUILT BY AUDI DEALER. FOUND PIECES OF OIL CONTROL RING FROM A PISTON IN OIL PAN, AIR LEAKING THROUGH INTAKE, SEATING SURFACE FOR INTAKE VALVE NUMBER 2 ON CYLINDER 4 WAS BURNT AND UNABLE TO SEAT PROPERLY DUE TO SPRING ON THAT VALVE BEING WEAKER THAN OTHERS.

211.   On January 25, 2016, a class vehicle driver reported the following incident dated June 4, 2015:[12]

> THE CONSUMER ALSO STATED THE VEHICLE

---

[11] https://www.nhtsa.gov/vehicle/2015/AUDI/A3

[12] https://www.nhtsa.gov/vehicle/2015/AUDI/Q3

BURNED 1/4 QUART OF OIL EVERY 5,000.

212.   On September 11, 2018, a class vehicle driver reported the following

incident dated August 19, 2018:

> I JUST BOUGHT THE CAR FROM LEASING IT IN MAY
> 2018.THEY DID A INSPECTION AT AUDI AND ABOUT 3
> WEEKS LATER THE ENGINE GOT STUCK AND CAR
> SMOKED FROM HOOD.

213.   On February 25, 2020, a class vehicle driver reported the following

incident dated February 15, 2020:[13]

> WHILE IN MOTION ON A DARK COUNTRY ROAD IN
> VT, MY 2015 AUDI Q5 CAR WITH JUST 61,000 MILES ON
> IT STARTED TO MAKE A LOUD NOISE AND BECAME
> UNDRIVABLE. THE DRIVER SAT ON THE ROAD AND
> WAITED FOR ROADSIDE ASSISTANCE AND A TOW
> TRUCK TO TAKE THE CAR TO THE NEAREST AUDI
> DEALER, WHICH WAS 40 MILES AWAY. SEVERAL
> DAYS LATER, AUDI DRAINED THE OIL IN THE ENGINE
> AND FOUND METAL SHAVINGS.

214.   On August 7, 2018, a class vehicle driver reported the following

incident dated July 8, 2018:

> TL* CONTACT OWNS A 2015 AUDI Q5. AFTERTHE
> VEHICLE UNDERWENT AN OIL CHANGE, THE OIL
> CHANGE WARNING INDICATOR ILLUMINATED. THE
> CONTACT MENTIONED THAT THE OIL NEEDED TO BE
> REFILLED EVERY 1,000 MILES. THE VEHICLE WAS
> TAKEN TO FATHERS & SONS AUDI WEST
> SPRINGFIELD (434 MEMORIAL AVE, WEST
> SPRINGFIELD, MA 01089, (413) 384-5229) WHERE THE
> OIL CONSUMPTION TEST SHOWED HOW MUCH OIL
> WAS BURNED AND THAT THE PISTONS WERE
> DAMAGED. THE DEALER STATED THAT THE PISTON
> AND SOLENOID NEEDED TO BE REPAIRED. THE
> VEHICLE WAS NOT REPAIRED. THE MANUFACTURER

---

[13] https://www.nhtsa.gov/vehicle/2015/AUDI/Q5/SUV/AWD

WAS NOTIFIED OF THE FAILURE.

215.   On November 5, 2020, a class vehicle driver reported the following

incident dated January 1, 2019:[14]

> THIS VEHICLE IS NEEDING A QUART OF OIL EVERY
> 300-400 MILES. IT'S A 6 YEAR OLD CAR, THERE IS
> SOMETHING SERIOUSLY WRONG WITH AUDI ENGINE
> DESIGN. A QUART OF OIL EVERY 300-400 MILES IS
> COMPLETELY UNACCEPTABLE. SINCE DAY 1 THIS
> VEHICLE HAS HAD AN OIL CONSUMPTION PROBLEM
> NOW AT 75K MILES AND THE PROBLEM JUST
> CONTINUES TO GET WORSE.

216.   On March 24, 2017, a class vehicle driver reported the following

incident dated January 24, 2017:

> TL* THE CONTACT OWNS A 2014 AUDI A4. WHILE
> DRIVING 55 MPH, THE VEHICLE BEGAN TO SHAKE.
> THE DEALER DETERMINED THAT THE PISTONS IN
> THE ENGINE LOST COMPRESSION AND THE ENGINE
> NEEDED TO BE REPLACED. THE VEHICLE WAS NOT
> REPAIRED. THE MANUFACTURER WAS MADE AWARE
> OF THE FAILURE. THE FAILURE MILEAGE WAS 62,000.

217.   On April 4, 2019 a class vehicle driver reported the following incident

dated April 1 2019:[15]

> EPC LIGHT ILLUMINATED, ROUGH IDLING, LOSS OF
> POWER, CAR WILL NOT TURN ON. 2017 IT DID THE
> SAME THING, FOUND ELECTRICAL FAULT NEAR GAS
> TANK (COULD HAVE BLOWN UP). AUDI FIX AT
> GOODWILL. COMPRESSION OF ENGINE WAS NEVER
> CHECKED. 2019 SAME THINGS HAPPENING, ENGINE
> LOST COMPRESSION IN 2 CYLINDERS. ALL SERVICES
> DONE AT AUDI. TOLD NEW ENGINE $10K-13K AND
> THEY WILL NOT HELP COVER COSTS. ONLY 60'000
> MILES DONE ON THE CAR AND NO OVERHEATING

---

[14] https://www.nhtsa.gov/vehicle/2014/AUDI/A4/4%252520DR/AWD

[15] https://www.nhtsa.gov/vehicle/2013/AUDI/A4/4%252520DR/AWD

ISSUES EVER.

218.   On February 27, 2019, a class vehicle driver reported the following

incident dated February 21, 2019:

> I AM CONSUMING 1.66 QUARTS IN 600 MILES WHICH
> HAS BEEN DOCUMENTED BY MY LOCAL AUDI
> DEALER. I WAS TOLD CALL AUDI USA CUSTOMER
> SUPPORT TO START CLAIM. I DID AND WAS TOLD
> THEY UNDERSTAND THAT MY CAR HAS AN ISSUE
> BUT SINCE IT DID NOT FALL IN THE YEARS OF CLASS
> ACTION LAWSUIT THEY WOULD NOT BE ABLE TO
> ASSIST IN ANY MATTER. NOW I HAVE DONE MY
> HOMEWORK AND HAVE FOUND AUDI DOES MAKE
> EXCEPTIONS BUT WILL DO NOTHING IN MY CASE.
> UNFORTUNATELY I CAN NOT UPLOAD DOCUMENTS
> FROM AUDI BECAUSE IT HAS ALL MY INFORMATION
> AND VEHICLE IDENTITY. BUT I CAN SAY MY AUDI
> CASE NUMBER IS [XXX].
> SO MAYBE AUDI CAN RESPOND TO MY CLAIM IN THE
> APPROPRIATE WAY AND EXTEND THEIR HELP TO
> OTHER VEHICLES WITH THE SAME ENGINE.

219.   On March 25, 2019, a class vehicle driver reported the following

incident dated February 6, 2019:

> THE CAR HAS BEEN BURNING THROUGH OIL. IT HAS
> BEEN REQUESTING A QUART OF OIL BE ADDED JUST
> ABOUT EVERY 500-700 MILES. ABOUT A YEAR AGO
> THE PROBLEM STARTED IN EARLY 2019 AND AT
> FIRST IT WAS JUST EVERY 1200-900 MILES THAT THE
> CAR WOULD ASK FOR AN EXTRA QUART OF OIL.
> THEN IN THE PAST 6 MONTHS IT HAS GOTTEN WORSE
> ASKING FOR A QUART OF OIL EVERY 500-700 MILES;
> THIS IS ALL IN ADDITION TO THE REGULARLY
> SCHEDULE OIL CHANGES.

220.   On March 7, 2019, a class vehicle driver reported the following

incident dated August 16, 2018:[16]

> TL* THE CONTACT OWNS A 2016 AUDI Q3. THE
> CONTACT STATED THAT THE VEHICLE WOULD NOT
> START PROPERLY AND WOULD CONSTANTLY
> DECELERATE WHILE IN THE MIDDLE OF TRAFFIC.
> THE CONTACT EXPERIENCED THE FAILURES OFTEN.
> ALSO, THE CHECK ENGINE INDICATOR
> ILLUMINATED. THE VEHICLE WAS TOWED TO AUDI
> DOMINION (21105 I-10, SAN ANTONIO, TX 78257, (888)
> 478-2089) WHERE IT WAS DIAGNOSED THAT A NEW
> FUEL SENSOR NEEDED TO BE INSTALLED. THE
> VEHICLE WAS REPAIRED, BUT THE FAILURES
> RECURRED. THE CONTACT TOOK THE VEHICLE BACK
> TO THE DEALER AND HAD IT REPAIRED AGAIN, BUT
> THE FAILURES RECURRED. DURING THE THIRD
> REPAIR, THE DEALER BROKE ONE OF THE
> HEADLIGHTS. SINCE THEN, THE FAILURES
> RECURRED MULTIPLE TIMES. THE MANUFACTURER
> WAS NOTIFIED AND DID NOT ASSIST. THE FAILURE
> MILEAGE WAS 49,500.

221.   On August 23, 2018, a class vehicle driver reported the following

incident dated August 15, 2018:

> WHEN STARTING VEHICLE (EITHER COLD OR WARM),
> VEHICLE HAS A SEVERAL SECONDS HESITATION
> WHEN PUSHING DOWN ACCELERATOR. VEHICLE
> DOES NOT MOVE, HESITATES THEN LURCHES
> FORWARD AS IF THE VEHICLE IS NOT GETTING
> SUFFICIENT POWER TO MOVE. VEHICLE HAS BEEN
> TO THE VOLKSWAGEN DEALER SEVERAL TIMES AND
> THEY HAVE BEEN UNABLE TO REPAIR. THIS IS
> DANGEROUS WHEN YOU ARE ENTERING A HIGHWAY
> OR CROSSING A MULTI LANE ROAD AND HAVE TO
> MOVE QUICKLY AND THE VEHICLE DOES NOT
> RESPOND.

222.   On January 21, 2021, a class vehicle driver reported the following

---

[16] https://www.nhtsa.gov/vehicle/2016/AUDI/Q3/SUV/FWD

incident dated January 21, 2021:[17]

> SEVERAL COMPLAINTS OF FAULTY PISTON RINGS
> CAUSING OIL CONSUMPTION TO BE 1 QUART EVERY
> 200/300 MILES FROM AUDI A4 MODELS 2009-2015.

223.   On November 5, 2019, a class vehicle driver reported the following

incident dated November 3, 2019:

> PISTON RINGS CAR IS SMOKING AND OIL IS COMING
> OUT OF THE MUFFLER THE CAR HAVE LAST THEN
> 100K MILEAGE.

224.   On September 26, 2018, a class vehicle driver reported the following

incident dated August 24, 2018:

> 2012 AUDI A4 QUATTRO USES (BURNS) AN EXCESSIVE
> AMOUNT OF OIL, CONSTANTLY HAVING TO ADD
> MOTOR OIL. MUST ADD A QUART OF OIL ON A
> MONTHLY BASIS AND DRIVING LESS THAN 1,000 PER
> MONTH.

225.   On November 1, 2018, a class vehicle driver reported the following

incident dated November 6, 2016:

> EXCESSIVE OIL CONSUMPTION ISSUES, CHECK
> ENGINE LIGHT IS ON AND AUDI WANTS TO CHARGE
> ME $12,000 TO REPAIR THE OIL CONSUMPTION DUE
> TO THEIR BEING DAMAGE TO MY PISTON RINGS.

226.   On October 1, 2018, a class vehicle driver reported the following

incident dated September 30, 2018:

> THE VEHICLE HESITATES WHEN ACCELERATING
> FROM A STOP OR OCCAISINGLY SURGES UNDER
> HEAVIER THROTTLE PRESSURE. THIS IS VERY
> DANGEROUS AND THE DEALERS ARE TELLING US

---

[17] https://www.nhtsa.gov/vehicle/2012/AUDI/A4/4%252520DR/FWD

THIS IS "NORMAL" BEHAVIOR. I SEE THAT MANY
DRIVERS HAVE REPORTED THIS ISSUE. DOES
SOMEONE HAVE TO GET INJURED BEFORE WE GET
TAKEN SERIOUSLY? VOLKSWAGEN NEEDS TO FIX
THE PROBLEM WITH THE ENGINE NOW.

227.  On April 24, 2017, a class vehicle driver reported the following

incident dated April 4, 2017:

I TURNED CAR OFF, WENT INTO A STORE CAME
BACK, STARTED CAR AND IT SOUNDED HORRIBLE,
AS IF TOTALLY FALLING APART. TURNED IT OFF,
TRIED AGAIN AND WOULD NOT START AT ALL.
DEALER SAID ENGINE WAS SHOT, SEIZED UP HAS TO
BE REPLACED. THEY HAVE BEEN MAINTAINING IT
SINCE THE DAY I BOUGHT IT. OIL CHANGES ALL UP
TO DATE. 30,000 MILE OUTSIDE OF WARRANTY.
DEALER HAS NO UNDERSTAND OF WHAT COULD
HAVE HAPPENED. COULD THIS HAVE HAPPENED
WHEN I WAS DRIVING? NO IDEA. HAS ANYONE
HEARD OF THIS HAPPENING TO THEIR AUDI A4 2012?

228.  On July 6, 2020, a class vehicle driver reported the following incident

dated June 11, 2020:[18]

ONLY 500 MILES FOLLOWING AN AUDI OIL CHANGE,
THE OIL SENSOR LIGHT WENT OFF NOTIFYING US TO
ADD ONE QUART OF OIL. WE ADDED ONE QUART OF
OIL AND CONTINUED DRIVING AND THEN THE LIGHT
WENT OFF AGAIN. WE CALLED AUDI SERVICE AND
THEY TOLD US TO FOLLOW THE INSTRUCTIONS AND
ADD ANOTHER QUART OF OIL. WE DID AND
REPEATED ONE MORE TIME AFTER ANOTHER HOUR
(75 MILES). AFTER FILLING THE THIRD TIME AND
DRIVING, WHITE SMOKE STARTED BILLOWING FROM
THE VEHICLE AND WE HAD THE CAR TOWED TO THE
AUDI DEALERSHIP 233 MILES FROM WHERE WE
WERE.

---

[18] https://www.nhtsa.gov/vehicle/2016/AUDI/A4/4%252520DR/AWD

229.   On November 6, 2020, a class vehicle driver reported the following incident dated October 28, 2020:

> BOUGHT IT 7 WEEKS AGO, 44,000 MILES. SEVERE OIL CONSUMPTION PROBLEM I'M FINDING OUT EVERYONE KNOWS ABOUT ALREADY WITH AUDI TURBOS AND WAS PREVIOUSLY A CLASS ACTION. I'M PUTTING OIL IN EVERY OTHER DAY AND FEEL THE PISTONS MISSING WHEN I DRIVE IN THE MORNING.

230.   On November 18, 2019, a class vehicle driver reported the following incident dated August 1, 2019:[19]

> TL* THE CONTACT OWNS A 2014 AUDI Q5. WHILE THE VEHICLE WAS PARKED OUTSIDE OF THE CONTACT'S RESIDENCE, THE CHECK ENGINE OIL WARNING INDICATOR ILLUMINATED WHEN THE VEHICLE WAS STARTED. THE CONTACT STATED THAT SHE NEEDED TO ADD OIL TO THE ENGINE EVERY TWO WEEKS. THE VEHICLE WAS TAKEN TO BIENER AUDI (LOCATED AT 795 NORTHERN BLVD, GREAT NECK, NY 11021, (516) 829-2834) THREE TIMES. ON OCTOBER 13, 2019, THE CONTACT WAS INFORMED THAT THE PISTON SIZES WERE TOO SMALL AND THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS 81,886.

231.   On October 3, 2018, a class vehicle driver reported the following incident dated September 13, 2018:

> TL* THE CONTACT OWNS A 2014 AUDI Q5. WHILE DRIVING 70 MPH, THE ENGINE TURNED OFF AND THE ELECTRONIC POWER CONTROL INDICATOR ILLUMINATED. THE VEHICLE WAS TOWED TO AUDI SAN DIEGO (9010 MIRAMAR RD, SAN DIEGO, CA 92126) AND REMAINED THERE FOR THREE WEEKS. THE MANUFACTURER WAS ALSO CONTACTED AND DID NOT ASSIST. THE VEHICLE WAS NOT DIAGNOSED OR

---

[19] https://www.nhtsa.gov/vehicle/2014/AUDI/Q5/SUV/AWD

REPAIRED. THE APPROXIMATE FAILURE MILEAGE
WAS 37,000. THE VIN WAS UNAVAILABLE. *TR.

232.   On August 29, 2018, a class vehicle driver reported the following

incident dated July 31, 2018:

> WHILE DRIVING THE CAR, CAR SUDDENLY
> STOPPED... A LOT OF LIGHTS CAME ON IN THE
> DASHBOARD. THERE WAS A BURNING SMELL INSIDE
> THE CAR. CAR WOULDN'T START AFTER THAT AND
> HAD TO BE MANUALLY PUSHED TO THE SIDE OF THE
> ROAD.
> AUDI SERVICE INSPECTED THE CAR AND SAID THAT
> ENGINE HAD INTERNAL DAMAGE AND I WAS ASKED
> TO REPLACE THE ENGINE. CAR ONLY HAD 35,000
> MILES ON IT. WARRANTY HAD EXPIRED JUST FEW
> MONTHS EARLIER. I HAD GOTTEN SERVICE DONE
> EVERY YEAR AT THE SAME AUDI SERVICE
> DEALERSHIP AND HAD GOTTEN A SERVICE JUST A
> FEW WEEKS BEFORE THIS HAPPENED! I WAS ASKED
> TO REPLACE THE ENGINE AT MY COST!! LATER I WAS
> OFFERED ASSISTANCE FROM AUDI, BUT IT STILL
> COST ME $4,500 OUT OF MY POCKET FOR A 4 YR OLD
> CAR WITH 35K MILES ON IT AND SERVICED EVERY
> YEAR BY AUDI!! LOST FAITH IN THE AUDI BRAND
> AND THE LOCAL AUDI DEALERSHIP & SERVICE.

233.   On May 29, 2019, a class vehicle driver reported the following

incident dated May 5, 2019:[20]

> THE VEHICLE SUFFERED COMPLETE ENGINE
> FAILURE AT 52,000 MILES. ON MAY 05'19 THE CAR
> WAS RUNNING SMOOTHLY AT PREVAILING
> HIGHWAY SPEED WHEN I STARTED TO HEAR THE
> SOUND OF MARBLES RATTLING AROUND IN THE
> ENGINE COMPARTMENT. PULLED OVER, AND THEN
> THE CHECK ENGINE LIGHT CAME ON.
> TOWED TO AUDI BURLINGTON, AND THE $159
> DIAGNOSTIC THE FOLLOWING MORNING MAY 06'19
> RESULTED IN A VOICE MAIL THAT SAID IN PART

---

[20] https://www.nhtsa.gov/vehicle/2013/AUDI/A5/C/AWD

"CAR ENGINE IS BLOWN, THE COST WILL BE $11,000,
PLEASE LET US KNOW WHAT YOU'D LIKE TO DO".
THEY ALSO SUGGESTED I COULD TRY TO GET AUDI
OF AMERICA TO ASSIST SO I OPENED A TICKET WITH
THEM ON MAY 07'19 (REFERENCE NUMBER IS
190452228).
THE SERVICE HISTORY IS INTACT BUT NEITHER AUDI
OF AMERICA NOR AUDI BURLINGTON (MA)
DEALERSHIP WILL ASSIST WITH THE REPAIR.

234. On February 17, 2016, a class vehicle driver reported the following incident dated April 1, 2015:[21]

IT CAME TO MY ATTENTION AT 70,000 MILES THAT I HAD
TO OCCASIONALLY ADD OIL BETWEEN OIL CHANGES. AT
95,000 MILES THE OIL CONSUMPTION INCREASED.
CURRENTLY AT 100,000 MILES OIL CONSUMPTION
INCREASED TO A QUART OF OIL EVERY 1000 MILES. TWO
AUTO REPAIR BUSINESSES, INCLUDING SHEARER AUDI OF
SOUTH BURLINGTON VERMONT, HAVE LOOKED AT MY
CAR. EACH REPAIR BUSINESS TELLS ME THAT THERE ARE
TWO COSTLY POSSIBILITIES TO FIX THE CAR. THE
BOTTOM LINE IS THAT IT SEEMS TO NEED A NEW ENGINE
BLOCK AND PISTONS AND ALL. IT SEEMS THAT THE
SHEARER AUDI SERVICE REP SHOULD HAVE WARNED ME
THAT THERE MIGHT BE A PROBLEM WITH THE OIL
CONSUMPTION BEFORE MY AUDI'S WARRANTY WAS UP.
IT ALSO SEEMS THAT THE 2012 Q5 SHOULD HAVE BEEN
INCLUDED IN THE CLASS ACTION OIL CONSUMPTION LAW
SUIT. AS YOU ARE AWARE, AUDI HAS BEEN AWARE OF
THIS DEFECT FOR YEARS AND YET THE 2012 2.0T ENGINE
DOES NOT SEEM TO BE REDESIGNED TO FIX THE
PROBLEM.

235. In addition to VW's review of NHTSA complaints, discovery will show that VW's internal consumer relations department and/or online reputation management services routinely monitor the internet for complaints about its

---

[21] https://www.nhtsa.gov/vehicle/2012/AUDI/Q5/SUV/AWD#complaints

products, including complaints posted on consumer forums and other social media

websites. The fact that so many customers made similar complaints put VW on

notice of the Piston Defect.

236.  On March 20, 2014, a class vehicle driver reported the following

incident on an online forum:[22]

> Car's a 2011 A4 with 35k miles on board, APR stage 1 tuned,
> all stock otherwise. I had a cylinder misfire that turned out to
> be a blown piston ring.

237.  On May 11, 2017, a class vehicle driver reported the following

incident on an online forum:[23]

> Anybody had an issue with a newish vehicle mine's a 2012 2.0
> TFSI with 44,000 miles. Massive Piston fail scored the bore
> hole and knackered the engine, managed to get a used engine
> but it still cost me £2700.00!!

238.  On May 18, 2016, a class vehicle driver reported the following

incident on an online forum:[24]

> For those of you who haven't looked at my last post. I'll catch
> you up real fast. Last week driving at 65-70mph (the speed
> limit) on my way back home to base. Car decides to go into
> limp mode while I'm in the fast lane (dangerous) barely got
> over in time. Got pulled over. Pulled codes. Misfire cyl 2 and
> random misfire. Cool. I'm at 63k miles LOW MILES…. Get to

---

[22] https://www.audizine.com/forum/showthread.php/587234-APR-tuned-A4-piston-failure

[23] https://www.audi-sport.net/xf/threads/broken-piston-on-2012-black-edition-a4.324604/

[24] https://www.audizine.com/forum/showthread.php/708042-My-misfire-no-compression-Audi-experience

compression test. Test #1 cyl 1, good. Cyl 2, 0% compression

239.   On May 20, 2016, a class vehicle driver reported the following incident on an online forum:[25]

> I've got a 2012 with just under 40K miles and my car is currently in the shop having new pistons put in. Driving around town, limp mode, run codes, cylinder one misfire, swap coils and plugs, no change. Leak down test shows 0% compression and Audi diagnosis is fried rings. Their labor only cost to replace only the rings in one piston - $4,800! It's currently at my indy shop where he found a broken piston on a car with less than 40,000 miles!

240.   On August 3, 2017, a class vehicle driver reported the following incident on an online forum:[26]

> I own a 2012 Q5 2.0 PP with approx 115000 miles The month I paid it off (last dec) the car began burning oil at a very fast rate. My car was just over the extended warranty I purchased also. When I took in the car for a small recall they informed me there was another recall. Some valve don't remember what its called but I knew through research of the oil burning it was part of the oil consumption test. I hoped it would fix the problem to no avail. Was informed they couldn't do anything. Spoke with everyone until I reached the GM.. The GM spoke with Audi corp and agreed to do and pay for the oil consumption test. It failed. They agreed to replace the pistons and rings at no cost to me which I was very grateful BUT it did not fix the problem. My wife has since driven 5000 miles and is on her third top off. She is burning approx 1100 miles per qt

241.   On July 29, 2016, a class vehicle driver reported the following incident

---

[25] https://www.audizine.com/forum/showthread.php/708042-My-misfire-no-compression-Audi-experience

[26]https://www.audizine.com/forum/showthread.php/776083-Q5-burning-oil-post-piston-ring-replacement

on an online forum:[27]

> I'm a writer with Middleburg Heights Audi in Ohio. And its still a very prevalent problem. Just next week alone we have scheduled 4 2.0 TFSI engines for piston replacement covered under Audi. Out technician alone has done over 800 of these by himself.

242.   On April 21, 2018, a class vehicle driver reported the following incident on an online forum:[28]

> The ring lands broke off one piston in this vehicle. The consensus from my previous post was the failure was the result of LSPI (low speed pre ignition). There is just the lightest of scratches in the bore of the broken piston while the rest of the bores look perfect. We are going to replace the pistons, rings, and rod bearings in this motor. My question is whether to hone the cylinders. The dealers replace rings and pistons in these vehicles all the time for oil burning. They do not hone the cylinders as far as I can tell. Does it make sense to put new rings and pistons without brush honing the cylinders? The engine has only 45 000 miles.

243.   On August 26, 2019, a class vehicle driver reported the following incident on an online forum:[29]

> My car is burning a lot of oil, probably 1 quart every 1200 miles. It is manageable but I can imagine this is good for the vehicle. I hope this will not require an engine rebuild.

244.   On May 15, 2019, a class vehicle driver reported the following

---

[27]https://bobistheoilguy.com/forums/threads/audi-broken-oil-control-rings-why.257011/

[28]https://diag.net/msg/md8ij6sq56novw2yrngi8kyym4

[29]https://www.audiworld.com/forums/q5-sq5-mki-8r-discussion-129/2013-audi-q5-oil-consumption-2978462/

incident on an online forum:[30]

> I recently purchased B8 A4 Quattro Prestige 6 Speed Manual.
> It's never been modded and had Audi service/maintenance plan
> up to 65K. Currently, it has around 83K miles. Car looks sexy
> and super tight on the road BUT it came with a CEL and on
> and off PEC light at times. I did basic diagnosis at home, it
> showed P0303 Cylinder 3 Misfire Detected. Like everyone
> else, I changed the coils, plugs = same issue continues to exist.
> Car runs rough and engine is shaky at low RPM. My next DIY
> fix was going to be fuel injector on 3. While I was at local
> Audi dealership for something different, I talked to a service
> adviser. He pulled up my VIN and showed me my car is under
> extended warranty from Audi for injectors 10Yr/120K &
> timing chain 10Yr/100K. He promised they would change the
> injectors under this warranty. I later found out there's a class-
> action lawsuit settlement for timing chain related issues (hmm..
> interesting right). He said I wouldn't have to pay anything out
> of pocket if I authorize them to replace the faulty injectors. If
> not, I'd be responsible for the $190 diagnostics fee. Few days
> later, I drop off my car to service hoping them to replace the
> injectors FREE and they gave me loaner car. He said they
> normally lend them to 2015 and up owners but he made it
> happen. He calls me later that same day and says "there's a
> misfire but the cylinder is bad, really bad because during the
> leak-down test the piston is shot". I am shocked at this point
> and confused why would a piston go bad on a well maintained
> car.

245. On October 9, 2012, a class vehicle driver reported the following

incident on an online forum:[31]

> Purchased audi a4 used at yonkers auto mall. live in ct have
> been to new york twice and now about to go third time monday
> consumes oil and dealership repair shop keeps stating this is
> normal and in spec pleaese help.

---

[30]https://www.audizine.com/forum/showthread.php/856065-2012-A4-B8-
Cylinder-3-Misfire-No-Compression-Engine-Issue-Dilemma

[31]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

246.   On December 6, 2012, a class vehicle driver reported the following

incident on an online forum:[32]

> I had the same problem ,erery month the audi a4 say on the computor that a qt of iol need needed and the oil is too low.I just brought this car from a dealer on boston rd about 5 month ago for 23000$ and finance through bank.What can i do ,this car is a lemon

247.   On March 20, 2013, a class vehicle driver reported the following

incident on an online forum:[33]

> I just purchased a a4 2.0t wagon on feb. 9 from private person. oil light came on 3 days after purchase. come to find out this is a common problem. took it to dealer for oil consumption test. – it failed and was determined it needed a $4200 piston ring replacement. no warranty, contacted audi of america several times and they refuse to pay for the repair. Furious

248.   On August 21, 2013, a class vehicle driver reported the following

incident on an online forum:[34]

> My car is being serviced right now at Audi of Melbourne. I have a 2012 a4 2.0 T. My engine low oil light came on. They are replacing numerous parts all related to this oil issue. They continue to sell cars and do not inform the public or customer about this issue knowing full well about it. The service manager stated they are replacing these particular parts in many vehicles. I expected to buy an Audi and get the highest quality of vehicle but, so far that is not the case

---

[32]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[33]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[34]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

249.    On October 10, 2013, a class vehicle driver reported the following

incident on an online forum:[35]

> Purchased a new 2013 Audi Q7 10 months. Love the car but
> just had my first oil light issue at 9551 miles. Dealer serviced
> at 5000. Dealer now claims the oil was slightly over filled
> which caused the warning light to illuminate. I've never
> heard of such a thing for an oil light function, low yes but
> overfilled? Implied we may have overfilled but have never
> even opened the hood. All services have been by the
> dealership

250.    On December 27th, 2013, a class vehicle driver reported the following

incident on an online forum:[36]

> I have a 2013 Audi A6. I have called the service desk
> repeatedly regarding the oil consumption issue (light would
> come on between 1,500-3,000 miles after being serviced).
> Each time I have been told that this is normal (one of the
> service reps even tried saying that every 1k miles is normal!).
> Looking at my email conversation I had with the dealership
> this problem goes back to May of 2012. Not too long ago I
> brought my car in for the 45k service, and already I am
> getting the low oil notification (I am at 48k). Looks like I
> will be calling the dealership again about this issue.

251.    On January 22, 2014, a class vehicle driver reported the following

incident on an online forum:[37]

> I recently reported Jan 6. I had the consumption test done
> and Audi replaced "crankcase breather valve, seal and
> separator". Advised 2 things: – that those having the same
> issue, the service work I just had completed usually fixes the
> problem. Also advised, to monitor the oil and if light comes
> on under 1500 miles to return for "phase 2" of test. When
> asked what phase 2 entailed, told that depending on test a

[35]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[36]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[37]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

call to AudiofAmerica headquarters would be necessary for next steps. Hopefully I will not need "phase 2". Obviously Audi recognizes this problem.

252.   On May 8, 2015, a class vehicle driver reported the following incident on an online forum:[38]

> I bought my Audi back in June of 2012. A month later I drove to a town about 1 hour away, on the highway. On the way there the oil light came on. I talked to the mechanic at the dealership about this and he told me it is normal for Audi to consume oil and to just come in when ever the car needs more oil. Every single time I drive on the highway for a total of about 2 hours I will need to add a quart of oil. My boyfriend recently moved to the opposite side of town and so now I drive about 10mn on the highway a few times a week. This has caused me to have to add oil once a month.

253.   On July 19, 2015, a class vehicle driver reported the following incident on an online forum:[39]

> I bought a CPO Q5 2012 in October 2014. I have not been driving the car that much in the first year, but this year (2015) it is basically my primary commute car. in 2014, the "low oil" yellow light came on a few month after I got the car, and I took it for service. It went on again a few month after the service, and the dealer top it off for free. Looking at the oil level, it seems like it is half way down already. So with record of burning a quarts of oil per 1000 mile, I started searching around and I learned about the issue and the class action. I confirmed that based on my engine serial number, it is one of the problematic ones subject to class lawsuit.

254.   On April 25, 2015, a class vehicle driver reported the following

---

[38]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/
[39]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

incident on an online forum:[40]

> Purchased a CPO Audi A4 in Syracuse back in October, oil
> light has continued to come on every 2k to 3k miles.
> Dealership has done 3 oil consumption test and continue to
> say to drive the car and fi the light comes back on and call
> us. I've called Audi Headquarters to make them aware of the
> issue, they have called Driver's Village to schedule another
> oil consumption test and have also said there is no recall on
> my 2013 A4 because the recall ended for 2012. I wish I
> would have known that Audi did not correct this issue
> because I would have went with Lexus or Mercedes instead.

255.   On November 23, 2015, a class vehicle driver reported the following

incident on an online forum:[41]

> I'm not sure Audi will ever have a solution to this problem. I
> have a 2013 Audi A4 2.0T with 60,000Km and it uses one
> liter / 800 Km's (497 miles)!

256.   On April 24, 2016, a class vehicle driver reported the following

incident on an online forum:[42]

> I purchased a New Q5 in 2012 but notice that the 2.0 Turbo
> engine was manufactured in August of 2011. It had the
> standard 4/50,000 warranty. I am 2000 miles outside of the
> warranty, with 52,000 on the vehicle… and the engine lost
> it's oil in a matter of hours and my engine has seized. Used
> engine will be $4900, with another $1300 in labor to install.

257.   On March 7, 2017, a class vehicle driver reported the following

incident on an online forum:[43]

---

[40]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[41]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[42]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

[43]https://www.lemonlaw.com/wordpress/audi-oil-consumption-problem/

> I purchased my Audi A4 private in August 2016. Currently
> my car has 109,000 miles. I drive within a 10 mile radius
> every other day or so. I must always put a quart of oil in
> every two weeks like clock work. Is there anything I can do
> to get Audi to do anything at all? An Audi dealership in Ohio
> told me that I would have to pay $8,000 to replace the
> pistons in the engine to fix the consumption issue.

258.  On March 29, 2019, a class vehicle driver reported the following

incident on an online forum:[44]

> Vehicle has 70 000 km (45 000 miles). Original customer
> complaint was check engine light on. Engine code was
> P0303. When vehicle was brought it was not missing and we
> road tested and could not make it miss. We moved the
> ignition coils and plugs and sent vehicle back out with
> customer.
> A few days later check engine light returned and vehicle
> was running rough. Code was P0303 again but now the
> compression on cylinder three was close to nothing and
> leakage was through to crankcase. Further diagnosis
> resulted in disassembly of the engine to find a piston with
> broken ring lands. The top of the piston looks perfect. I
> am not sure the cause of the piston failure.

259.  On January 1, 2016, a class vehicle driver reported the following

incident on an online forum:[45]

> Bought this car second hand in 2016. Noticed the oil light in
> the 1st week but just thought it needed a top up. Since then a
> quart of oil is needed every 300 km! There is no leak and I
> don't know where the oil is going. A full gas tank will take
> me 600km so that two quarts of oil for every tank of gas!!
> Coming from cars which have never needed additional oil
> between service, this is shocking and for such a brand name
> car, highly unacceptable. I will check with the dealers this

---

[44]https://diag.net/msg/m584321f5dvhwmgaq3dx15089t

[45]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

week to see if there as a fix as my research now shows me the problem is well known. Unacceptable for a modern car!

260.   On April 1, 2017, a class vehicle driver reported the following incident on an online forum:[46]

> I bought a 2012 Audi Q5 in in 2015. It was a certified pre-owned Audi straight from the dealer with 39,000 miles on it. For the first 20,000 miles of owning this car, it was all I had hoped for. Then, the check engine and oil light game started. At first, adding oil meant that it would it go another 1500-2000 miles without issue. Then, around 75k, it went to 500 to 750 miles. Once it hit 95k, it dropped to every 400 to 600 miles that it needed oil. I am at 100k and desperately want to dump this lemon. Unfortunately, I have another 16 payments on this garbage car. I've spoken with a local mechanic about it and he says the fix is replacing the pistons etc, basically, a $9k job to fix it.

261.   On November 17, 2015, a class vehicle driver reported the following incident on an online forum:[47]

> I purchased my Q5 from a NY Audi dealer in March of 2012, my car was built February 2012.
> Approximately, 2 1/2 years ago, my cars minimum oil light went on 1,000 miles short of its next oil change, which had never happened before. I called the dealership, I was told "this was to be expected, was just the way these cars aged". I added the recommended 5W40 European synthetic oil. This continued, in increasing intervals.
> I repeatedly asked the dealership about this and was told again and again this was fine and to keep adding oil. This car was only every serviced at Audi dealerships and has primarily highway miles. Last December, the dealership began only dealing in VW. So in the spring when I needed tail light and hvac fan work I went to the Audi dealer in

---

[46]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

[47]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

> Albany/Latham. They completed $1500. worth of work. I
> asked again about the oil, at that point I was adding a quart
> every 500 miles. I was told there was a known problem
> w/this causing early piston failure but that it was with the
> 2009-2011 models and to fix it would cost approximately
> $6000.! And, you guessed it, was told to keep adding oil!!!!

262.   On May 5, 2017, a class vehicle driver reported the following incident

on an online forum:[48]

> Audi wasted my time and money proving my car failed oil
> consumption test. I was sent on wild goose chase for
> receipts, knowing they would not fix my car. For 1 person at
> Audi, having all power to grant you Good Will.. to fix your
> car. I can't believe Audi won't support their product and fix
> these cars. Problem obviously not solved.

263.   On February 1, 2016, a class vehicle driver reported the following

incident on an online forum:[49]

> The car has been burning extra oil for about 5 months. I have
> brought it to the dealership twice and they say there are no
> issues. It is now using an extra quart of oil every 500 miles
> or 10 days or so. This is truly excessive and I know from this
> site that Audi has already settled a class action suit for the
> same issue with other models.

264.   On November 30, 2015, a class vehicle driver reported the following

incident on an online forum:[50]

> The Purchased the car new from the dealer. It has always
> consumed oil but late last year the oil consumption jumped.

---

[48]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

[49]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

[50]https://www.carcomplaints.com/Audi/Q5/2012/engine/oil_consumption_excessive.shtml

It currently has 90K miles and is using about a quart every 500 miles. Audi has a class action lawsuit settlement but is claiming our car is just out of the extended warranty and because we had it serviced outside of the dealership for a period of time, they prefer to spend their money fixing cars that they maintained (made money on).

Spent a bunch of money to purchase this car and now they say its needs a 8K fix, total junk. Audi's lack of customer service, poor product quality and their larger corporate dishonesty (VW fraud) is disgusting.

265.   On May 16, 2016, a class vehicle driver reported the following incident on an online forum:

I noticed an excessive oil consumption over a year ago but the dealer led me to believe no one else had this issue. Over the past few months the issue seems to get worst - 1/2 quart every 2000 miles. I called the dealer but they told me I would have to pay for the repairs although Audi knows of the issue. Called Audi Customer Service and after checking my VIN they told me the same, although it is well known the problem was fixed mid year of that model year. I was about to purchase another Audi later this year but it would seem it would be a poor decision on my part: love the product but hate the fact Audi does not stand behind their product on a known issue

266.   On February 28, 2017, 2017, a class vehicle driver reported the following incident on an online forum:[51]

The dealer recommended piston replacement... just like all the previous model years subject to the lawsuit. We are burning 1.13 quarts every thousand miles. The cost of rthe epair is $6,000.00. The regional network is willing to cover $2K for parts, but no labor.

---

[51]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

267.   On May 22, 2017, a class vehicle driver reported the following

incident on an online forum:[52]

> Audi A4 2012 excessive oil consumption. Dealer did the oil
> consumption test and piston and rings need to be replaced.
> Already spent over $1K on new breather crankshaft repairs
> etc. Did anyone get AoA to pay for new piston and rings? Its
> a $6K repair that I am unwilling to pay because it should not
> be doing this crap for such an expensive car.

246.   On May 31, 2017, a class vehicle driver reported the following

incident on an online forum:[53]

> My 2013 A4 (purchased in June 2012) had major oil
> consumption problem. Battled with the dealer and Audi.
> Failed oil consumption test but Audi was not going to repair
> under warranty. By now my vehicle had 115000km -problem
> was gradually getting worse. Filed a CAMVAP claim
> (Canadian Dealer Arbitration). Now Audi and dealer
> changed their minds. Car was in recently for piston
> replacement under "goodwill warranty".

247.   On July 18, 2017, a class vehicle driver reported the following incident

on an online forum:[54]

> We just bought a used 2012 Audi A4 (115k mileage) and just
> discovered it has this cursed problem. It burns a quart in 200
> miles... that is not a typo... every 200 miles we now have to
> top it off.

---

[52]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

[53]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

[54]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

248.   On July 18, 2017, a class vehicle driver reported the following incident on an online forum:[55]

> We just bought a used 2012 Audi A4 (115k mileage) and just discovered it has this cursed problem. It burns a quart in 200 miles... that is not a typo... every 200 miles we now have to top it off.

249.   As discussed above, VW issued a Technical Service Bulletin to address the piston issues in its 2.0T engines.  On October 16, 2013, VW issued a TSB entitled "Engine oil consumption too high." In the TSB, which applied to the 2.0T-equipped Audi A4, A5, and Q5 of various model years between 2009 and 2011, VW admitted that its customers were complaining of "excessive engine oil consumption," and directed its dealerships to replace the 2.0T engine's crankcase pressure regulating valve and front crankshaft seal in response. A copy of this TSB is attached as Exhibit 1.

250.   On September 5, 2013, VW issued a revised TSB for all of its vehicles, adding the model years 2012 through 2014.  This TSB cautioned dealer technicians to clean "metal debris resulting from the mechanical problem" out of the intake manifold and other areas when installing a replacement engine.  Notably, the TSB stated that "[e]ngine damage caused by failure to clean debris from assemblies that

---

[55]https://www.audiworld.com/forums/a4-b8-platform-discussion-128/excessive-oil-consumption-2012-model-2915461/

are transferred to a replacement engine is not covered by Warranty." A copy of this TSB is attached as Exhibit 2.

251.   A significant portion of VW's technical instructions to dealerships are only available on proprietary VW software and systems.  Dealership technicians are instructed by VWGoA-given trainings how to use this software, which provides guided, step-by-step instructions on diagnosing, repairing, and communicating with consumers about problems with their vehicles.  Technicians at Audi authorized dealerships are also routinely instructed to open TAC cases with VWGoA regarding certain repairs and to follow the instructions given by VWGoA.  As a result, discovery will show that that VWGoA has hundreds, if not thousands of TAC cases in its records showing consumer and dealer complaints about piston ring and/or piston failure, and that VWGoA has instructed dealerships to replace the piston rings, the pistons, and even the engine block itself as a result of those failures.

252.   The existence of the Piston Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Piston Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

253.   Reasonable consumers, like Plaintiffs, expect that a vehicle's engine is safe, will function in a manner that will not pose a safety risk, and is free from

defects. Plaintiffs and Class Members further reasonably expect that VW will not sell or lease vehicles with known safety defects, such as the Piston Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect VW to conceal and fail to disclose the Piston Defect to them, and to then continually deny its existence.

## VW Has Actively Concealed the Piston Defect

254.   Despite its knowledge of the Piston Defect in the Class Vehicles, VW actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, VW failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

> (a)   any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the pistons within the 2.0T Engine;

> (b)   that the Class Vehicles, including the pistons, were not in good in working order, were defective, and were not fit for their intended purposes; and

> (c)   that the Class Vehicles and the pistons were defective, despite the fact that VW learned of such defects as early as early 2012.

255.   When consumers present their Class Vehicles to an authorized VW dealer for piston related repairs, rather than repair the problem under warranty, VW dealers choose to inform consumers that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty.  In this manner, VW avoids paying for warranty repairs and unlawfully transfers the cost of the Piston Defect to Plaintiffs and other consumers.

256.   In particular, VW has periodically issued other communications to its dealerships reminding them that the two-step oil consumption test is necessary even when a customer comes in with proof of oil consumption.   VW reminds its technicians to tell consumers, "all internal combustion engines consume a certain amount of oil," and certain vehicles "consume more oil during the break-in period."

257.   However, some technicians do acknowledge that the Piston Defect exists, as experienced by certain Plaintiffs.  They say it is a "known defect."  Despite this, VW has not issued any communications to Class Members acknowledging the Piston Defect, continuing to allow vehicles with a known safety risk to remain on the road.

258.   Further, rather than issue a TSB that specifically addresses the failures of the piston rings and/or pistons, a copy of which VW is required to file with NHTSA, VW has instead kept information regarding the Piston Defect in its

proprietary Offboard Diagnostic Information System ("ODIS").  ODIS, as well as

other proprietary software, provides dealership technicians with guided, step-by-step

instructions on diagnosis and repair.  These systems contain information about the

Piston Defect, or otherwise inform technicians to contact VWGoA directly via TAC

cases, at which time VWGoA informs technicians to check for piston failure and

resultant engine damage, and if found, replace the pistons and/or the engine blocks.

ODIS and the other proprietary systems are not accessible to Plaintiffs or the general

public.   Moreover, when consumers call VWGoA's customer service hotline

directly, VWGoA's response is only to direct them to take their vehicles to an

authorized dealership for diagnosis.

259.   VW has caused Class Members to expend money at its dealerships to

diagnose, repair or replace the Class Vehicles' pistons and/or related components,

despite VW's knowledge of the Piston Defect.

### The Agency Relationship between Volkswagen Group of America, Inc. d/b/a Audi of America and its Network of Authorized Dealerships

260.   In order to sell vehicles to the general public, VWGoA enters into

agreements with its nationwide network of authorized dealerships to engage in retail

sales with consumers such as Plaintiffs. In return for the exclusive right to sell new,

VW or Audi-branded vehicles, the authorized dealerships are also permitted under

these agreements with VWGoA to service and repair these vehicles under the

warranties VWGoA provides directly to consumers who purchased new vehicles

from the authorized dealerships. Accordingly, VWGoA's authorized dealerships are VWGoA's agents, and the consumers who purchase or lease VWGoA vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their VWGoA vehicles locally. Because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

261.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by VWGoA. VWGoA's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of VWGoA's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

262.   VWGoA issued the express warranty to the Plaintiffs and the Class members. VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA also is responsible for the content of the Monroney Stickers

on Audi-branded vehicles. Because VWGoA issues the express warranty directly to the consumers, the consumers are in direct privity with VWGoA with respect to the warranties.

263. In promoting, selling, and repairing its defective vehicles, VWGoA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive VWGoA representatives and agents. That the dealers act as VWGoA's agents is demonstrated by the following facts:

(a) The authorized Audi dealerships complete all service and repair according to VWGoA's instructions, which VWGoA issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents;

(b) Technicians at Audi dealerships are required to go to at least yearly VWGoA-given trainings in order to remain certified to work on Audi-branded vehicles, at which they receive training on VW-proprietary systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing Audi-branded vehicles;

(c) Consumers are able to receive services under VWGoA's issued New Vehicle Limited Warranty only at VWGoA's authorized dealerships, and they are able to receive these services because of the agreements between VWGoA and the authorized dealers. These agreements provide VWGoA with a significant amount of control over the actions of the authorized

dealerships;

(d)   The warranties provided by VWGoA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)   VWGoA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(f)   VWGoA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with VWGoA's authorization.

(g)   VWGoA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

(h)   VWGoA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized VWGoA dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

264.   Indeed, VWGoA's warranty booklets make it abundantly clear that VWGoA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the

consumers repeatedly to seek repairs and assistance at their "authorized Audi dealer." For example, the warranty booklets state, "[a]ny authorized Audi dealership in the United States, including its territories, will honor this warranty." Further, the warranty "only applies to vehicles or parts and accessories that are imported or distributed by Audi, and vehicles original sold by an authorized Audi dealer in the United States, including its territories." Under the terms of the warranty repairs will be provided by "[y]our Audi dealer." The booklets direct Plaintiffs and class members, should they have a problem or concern, to "discuss them first with management personnel at your authorized Audi dealership. In the event your dealership does not respond to your satisfaction, Audi offers additional assistance. You may contact the Audi Customer Experience Center via telephone or mail as well as email, chat, Twitter, and Facebook…A Customer Advocate, in conjunction with authorized Audi dealer, will work with you to gather and review all the facts relating to your concern."

265. Further, VWGoA d/b/a Audi of America also offers certain "complimentary services," including a pre-delivery inspection and the first maintenance on the vehicle free of charge. Both of these services are actually completed by "your authorized dealer." For example, "[p]rior to delivery, your authorized Audi dealer completed an extensive and detailed inspection of your

vehicle."  Further, consumers are directed to "contact your authorized Audi dealer to schedule" their complimentary first service.

266.   Further, as noted by VWGoA on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships.  In touting its "300+ Point Dealer Inspection," VWGoA states, "[o]nly once the vehicle passes a detailed dealer inspection does it earn the right to be part of the Audi Certified pre-owned program."[56] As such, authorized Audi dealerships inspect used vehicles on VWGoA's behalf and it is dealer's certification of quality of these vehicles is sufficient under standards published by VWGoA that is enough to bind VWGoA to the more generous warranty terms of the Certified Pre-Owned Warranty. As stated on the website, "only after this exhaustive dealer inspection are we confident in backing the vehicle with our Audi Certified pre-owned Limited Warranty."[57] Moreover, the website also states that such vehicles are "rigorously inspected by Audi trained technicians to ensure each Audi Certified pre-owned vehicle is in optimal condition."[58]

267.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of VWGoA. Plaintiffs and each of the members of the Class

---

[56] *See* https://www.audiusa.com/us/web/en/shopping-tools/certified-pre-owned.html (last visited July 15, 2021).

[57] *Id*.

[58] *Id*.

have had sufficient direct dealings with either VWGoA or its agent dealerships to establish privity of contract between VWGoA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and VWGoA.

## VW Has Unjustly Retained A Substantial Benefit

268.   Defendants unlawfully failed to disclose the Piston Defect to induce Plaintiff sand other Class Members to purchase or lease the Class Vehicles.

269.   Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

270.   Defendants unlawfully induced Plaintiffs and class members to purchase their respective Class Vehicles by concealing a material fact (the defective pistons within the 2.0T Engine). Had Plaintiffs and class members known of the subject defect, they would have paid less for the Class Vehicles or would or not have purchased them at all.

271.   Accordingly, VW's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did - and likely will continue to - deceive consumers, should be disgorged.

## TOLLING OF THE STATUTE OF LIMITATIONS

272.             Any applicable statute(s) of limitations have been tolled by VW's knowing and active concealment and denial of the facts alleged herein.

Plaintiff and members of the Class could not have reasonably discover the true, latent nature of the Piston Defect until shortly before this action was commenced.

273.　　　　In addition, even after Class Members contacted Defendant VWGoA and/or its authorized agent dealerships for vehicle repairs within the statute of limitations for repairs concerning the Piston Defect and its symptoms, they were routinely told that the Class Vehicles were not defective, that oil consumption was normal, and/or given illusory repairs.

274.　　　　Defendants were and remain under a continuing duty to disclose Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles because they had superior knowledge of the Piston Defect and its associated safety risk, provided partial disclosures about the functionality and ability of the Class Vehicles to provide safe, reliable transportation, and the facts about the Piston Defect were not reasonably discoverable by Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

275.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

276.  The Class and Sub-Class are defined as:

**Class**:  All individuals in the United States who purchased or leased any 2012-2017 Audi vehicle equipped with the 2.0-liter turbocharged engines ("Class Vehicles.")

**California Sub-Class**:  All members of the Class who purchased a Class Vehicle in the State of California.

**CLRA Sub-Class**:  All members of the California Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**Implied Warranty Sub-Class**:  All members of the Class who purchased or leased their Class Vehicles in the State of California.

**Florida Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Florida.

**Georgia Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Georgia.

**Illinois Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Illinois.

**Louisiana Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Louisiana.

**Minnesota Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Minnesota.

**Nevada Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Minnesota.

**New Jersey Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of New Jersey.

**Oregon Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Oregon.

**Pennsylvania Sub-Class:** All members of the Class who purchased a Class Vehicle in the Commonwealth of Pennsylvania.

**Texas Sub-Class:**  All members of the Class who purchased a Class Vehicle in the State of Texas.

**Washington Sub-Class:** All members of the Class who reside in Washington State and purchased a Class Vehicle.

277.   Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

278.   **Numerosity:**   Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is easily in the multiple thousands and thus significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

279.  **Typicality:**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by VW. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective piston rings and/or pistons, as well as other engine components damaged by the defective parts. Repairs for the Piston Defect average between $3,000 and $14,000.  Furthermore, the factual bases of VW's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

280.  Commonality:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually.  These common legal and factual issues include the following:

> (a)  Whether Class Vehicles suffer from defects relating to the pistons within the 2.0T Engine;

> (b)  Whether the defects relating to the pistons in the 2.0T Engines constitute an unreasonable safety risk;

> (c)  Whether Defendants knew about the defects pertaining to the Pistons in the 2.0T Engines and, if so, how long Defendants have known of the defect;

(d)     Whether the defective nature of the pistons constitutes a material fact;

(e)     Whether Defendants have had an ongoing duty to disclose the defective nature of the pistons in the 2.0T Engine to Plaintiff and Class Members;

(f)     Whether Plaintiff and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)     Whether Defendants knew or reasonably should have known of the defects pertaining to the pistons within the 2.0T Engine before it sold and leased Class Vehicles to Class Members;

(h)     Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective pistons within the 2.0T Engine and/or its components;

(i)     Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective pistons and/or its components;

(j)     Whether Defendants breached the implied warranty of

merchantability pursuant to the Song-Beverly Act;

(k)     Whether VWGoA breached its express warranties under UCC
        section 2301;

(l)     Whether VWGoA breached its express warranty under the laws
        of Florida, Illinois, Louisiana, Minnesota, Nevada, New Jersey,
        Pennsylvania, Texas, and Washington;

(m)     Whether Defendants breached their implied warranties under
        the laws of Florida, Illinois, Louisiana, Minnesota, Nevada,
        New Jersey, Pennsylvania, Texas, and Washington; and

(n)     Whether Defendants breached the consumer protection laws of
        Florida, Georgia, Illinois, Louisiana, Minnesota, Nevada, New
        Jersey, Pennsylvania, Texas, and Washington.

281.   **Adequate Representation:**   Plaintiffs will fairly and adequately
protect the interests of the Class Members. Plaintiffs have retained attorneys
experienced in the prosecution of class actions, including consumer and product
defect class actions, and Plaintiffs intend to vigorously prosecute this action.

282.   **Predominance and Superiority:**   Plaintiffs and Class Members have
all suffered, and will continue to suffer, harm and damages as a result of Defendants'
unlawful and wrongful conduct. A class action is superior to other available methods
for the fair and efficient adjudication of the controversy. Absent a class action, most

Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION
**(Violations of California's Consumers Legal Remedies Act,
California Civil Code § 1750, *et seq*.)
(On Behalf of the CLRA Sub-Class against all Defendants)**

283.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

284.   Plaintiff Jennie Rieger ("California Plaintiff") brings this cause of action individually and on behalf of the CLRA Sub-Class against all Defendants.

285.   Defendants are a "person" as defined by California Civil Code § 1761(c).

286.   California Plaintiff and the CLRA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

287.   By failing to disclose and concealing the defective nature of the pistons within the 2.0T Engine from California Plaintiff and CLRA Sub-Class members, Defendants violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their 2.0T Engine had characteristics and benefits that they do not have, and represented that the Class Vehicles and their 2.0T Engine were of a particular standard, quality, or grade when they were of another. See Cal. Civ. Code §§ 1770(a)(5) & (7).

288.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

289.   Defendants knew that the Class Vehicles and their 2.0T Engine suffered from an inherent defect, were defective and were not suitable for their intended use.

290.   As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles, including California Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, California Plaintiff and the CLRA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and its components are substantially certain to fail before their expected useful life has run.

291.   Defendants were under a duty to California Plaintiff and the CLRA Sub- Class members to disclose the defective nature of the 2.0T Engine and/or the associated repair costs because:

(a)   Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' Pistons within the 2.0T Engine;

(b)   California Plaintiff and the CLRA Sub-Class members could not reasonably have been expected to learn or discover that their 2.0T Engine had a dangerous safety defect until it manifested; and

(c)   Defendants knew that California Plaintiff and the CLRA Sub-Class members could not reasonably have been expected to learn of or discover the safety defect.

292.   In failing to disclose the defective nature of 2.0T Engine, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

293.   The facts Defendants concealed from or failed to disclose to California Plaintiff and the CLRA Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less. Had California Plaintiff and the

CLRA Sub-Class members known that the Class Vehicles' 2.0T Engines were defective, they would not have purchased or leased the Class Vehicles or would have paid less for them.

294.   California Plaintiff and the CLRA Sub-Class members are reasonable consumers who do not expect the engines installed in their vehicles to exhibit problems such as the Piston Defect. This is the reasonable and objective consumer expectation relating to a vehicle's engine.

295.   As a result of Defendants' conduct, California Plaintiff and the CLRA Sub-Class members were harmed and suffered actual damages because, inter alia, the Class Vehicles exhibited and will continue to exhibit problems such as the Piston Defect.

296.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, California Plaintiff and the CLRA Sub-Class members suffered and will continue to suffer actual damages.

297.   California Plaintiff and the CLRA Sub-Class members are entitled to equitable relief.

298.   California Plaintiff and the CLRA Sub-Class seek to recover actual damages, an order enjoining VW's unfair or deceptive acts or practices and equitable relief under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

299.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, via letter dated April 20, 2021, has served VW with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the Class Vehicles purchased by California Plaintiff and California Sub-Class Members, and demanded that VW, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. VW has not responded to that letter and did not agree to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

**SECOND CAUSE OF ACTION**
**Breach of Implied Warranty Pursuant to Song-Beverly**
**Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq.*)**
**(On behalf of the Implied Warranty Sub-Class against all Defendants)**

300.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

301.   California Plaintiff brings this cause of action against individually and on behalf of the Implied Warranty Sub-Class (IW Sub-Class).

302.   Defendants were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

303.   Defendants provided California Plaintiff and the Implied Warranty Sub-Class members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which

they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

304.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

305.    Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and the IW Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

306.    The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

307.    As a result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, California Plaintiff and the IW Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

308.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

309.   California Plaintiff and IW Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

310.   California Plaintiff and IW Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  California Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

311.   In addition, on or about April 20, 2021, California Plaintiff gave notice to Defendants that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

312.   Because California Plaintiff purchased her vehicle from authorized VW dealers, she is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

313.   As a direct and proximate cause of VW's breach, California Plaintiff and the IW Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, California Plaintiff and the IW Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

314.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, California Plaintiff and the IW Sub-Class Members have been damaged in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Violations of California Business & Professions Code § 17200, *et seq*.)**
**(On Behalf of the California Sub-Class against all Defendants)**

315.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

316.   California Plaintiff brings this cause of action individually and on behalf of the California Sub-Class (CA Sub-Class).

317.   As a result of their reliance on Defendants' omissions, owners and/or lessees of the Class Vehicles, including California Plaintiff, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, California Plaintiff and the CA Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engines and/or its components are substantially certain to fail before their expected useful life has run.

318.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

319.   California Plaintiff and the CA Sub-Class members are reasonable consumers who do not expect their engine to exhibit problems such as loss of power, premature wear, and frequent replacement or repair.

320.   Defendants knew the Class Vehicles and their 2.0T Engines were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

321.   In failing to disclose the Piston Defect, Defendants have knowingly and intentionally concealed material facts and breached its duty not to do so.

322.   Defendants were under a duty to California Plaintiff and the CA Sub-Class members to disclose the defective nature of the Class Vehicles and their 2.0T Engine because:

    (a)    Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles' 2.0T Engine; and

    (b)    Defendants actively concealed the defective nature of the Class Vehicles and their 2.0T Engine piston failures from California Plaintiff and the CA Sub-Class.

323.   The facts Defendants concealed from or failed to disclose to California Plaintiff and the CA Sub-Class members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Class Vehicles. Had they known of the Piston Defect, California Plaintiff and the other CA Sub-Class members would have paid less for Class Vehicles equipped with the 2.0T Engine or would not have purchased or leased them at all.

324.   Defendants continued to conceal the defective nature of the Class Vehicles and their 2.0T Engine even after California Plaintiff and the other CA Sub-Class members began to report problems.

325.   Defendants' conduct was and is likely to deceive consumers.

326.    Defendants' acts, conduct, and practices were unlawful, in that they constituted:

(a)    Violations of California's Consumers Legal Remedies Act;

(b)    Violations of the Song-Beverly Consumer Warranty Act, including California Civil Code §§ 1792 and 1791.1.; and

(c)    Violations of the Magnuson-Moss Warranty Act.

327.    By their conduct, Defendants have engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

328.    Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business and were capable of deceiving a substantial portion of the purchasing public.

329.    As a direct and proximate result of Defendants' unfair and deceptive practices, California Plaintiff and the other CA Sub-Class members have suffered and will continue to suffer actual damages.

330.    California Plaintiff and the other CA Sub-Class members will be unable to reply on the advertising and labeling of Class Vehicles in the future, and so will not purchase the Class Vehicles although they would like to.

331.    Defendants have been unjustly enriched and should be required to make restitution to Plaintiff and the other CA Sub-Class members pursuant to §§ 17203 and 17204 of the Business & Professions Code.

## FOURTH CAUSE OF ACTION
### Breach of Express Warranty
### (CAL. COM. CODE §§ 2313 and 10210)
### (On behalf of the California Sub-Class against VWGoA)

332.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

333.   California Plaintiff brings this cause of action individually and on behalf of the California Sub-Class against VWGoA.

334.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

335.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

336.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

337.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under California law.

338.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

339.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

340.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

341.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing California Plaintiff's and Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

342.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect California Plaintiff and the California Sub-Class Members. Among other things, California Plaintiff and the California Sub-

116

Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

343.   California Plaintiff and the California Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

344.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

345.   California Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  California Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

346.   In addition, on or about April 20, 2021, California Plaintiff gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

347.   As a direct and proximate cause of the breach of express warranty by VWGoA, California Plaintiff and the other CA Sub-Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, California Plaintiff and the other CA Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

348.   California Plaintiffs and the other CA Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## FIFTH CAUSE OF ACTION
**(Violations of the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201-.213, *et seq*.)**
**(On Behalf of the Florida Sub-Class against all Defendants)**

349.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

350.   Plaintiff Aloha Davis ("Florida Plaintiff") brings this cause of action individually and on behalf of the Florida Sub-Class against all Defendants.

351.   Florida Plaintiff and the Florida Sub-Class Members are "consumer[s]" as that term is defined in Fla. Stat. § 501.203(7).

352.   VW engaged in "trade or commerce" in Florida as that term is defined in Fla. Stat. § 501.203(8).

353.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  VW engaged in unfair and deceptive practices that violated the FDUTPA as described above.

354.   VW participated in and engaged in deceptive business or trade practices prohibited by the FDUTPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

355.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that

caused Florida Plaintiff and the Florida Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

356.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

357.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

358.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

359.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

360.   VW knew or should have known that its conduct violated the FDUTPA.

361.   Florida Plaintiff and the Florida Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

362.   Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

363.   VW owed Florida Plaintiff and the Florida Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)   intentionally concealed the foregoing from Florida Plaintiff and the Florida Sub-Class Members; and/or

(c)    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Florida Plaintiff and the Florida Sub-Class Members that contradicted these representations.

364.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class

Vehicles, and reliance by Florida Plaintiff and the Florida Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

365.   Having volunteered to provide information to Florida Plaintiff and the Florida Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Florida Plaintiff and the Florida Sub-Class Members.

366.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Florida Plaintiff and the Florida Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

367.   Florida Plaintiff and the Florida Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Florida Plaintiff and

the Florida Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

368.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

369.   Defendants' violations present a continuing risk to Florida Plaintiff and the Florida Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

370.   As a proximate and direct result of VW's unfair and deceptive trade practices, Florida Plaintiff and members of the Florida Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

371.   The Florida Plaintiff and members of the Florida Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

372.   Florida Plaintiff and the Florida Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because VW acted with willful and conscious disregard of the rights and safety of others, VW's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## SIXTH CAUSE OF ACTION
### Breach of the Implied Warranty of Merchantability
(FLA. STAT. §§ 672.314 AND 680.212)
**(On behalf of the Florida Sub-Class against all Defendants)**

373.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

374.   Florida Plaintiff brings this cause of action individually and on behalf of the Florida Sub-Class against all Defendants.

375.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under Fla. Stat. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d ).

376.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under Fla. Stat. § 680.1031(1)(p).

377.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Fla. Stat. §§ 672.105(1) and 680.1031(1)(h).

378.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Fla. Stat. §§ 672.314 and 680.212.

379.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Florida Plaintiff and the Florida Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and the Florida Sub-Class Members, with no modification to the defective engines.

380.   VW provided Florida Plaintiff and Florida Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

381.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other

things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

382.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Florida Plaintiff and Florida Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

383.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

384.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Florida Plaintiff and Florida Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

385.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Fla. Stat. §§ 672.314 and 680.212.

386. Florida Plaintiff and the Florida Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

387. Florida Plaintiff and the Florida Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources. Florida Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer on multiple occasions.

388. Because Florida Plaintiff purchased her vehicle from an authorized VW dealer, she is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

389. As a direct and proximate cause of VW's breach, Florida Plaintiff and the Florida Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and the Florida Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

390.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Florida Plaintiff and the Florida Sub-Class Members have been damaged in an amount to be proven at trial.

**SEVENTH CAUSE OF ACTION**
**(Violations of the Georgia Fair Business Practices Act,**
**Ga. Code Ann. § 10-1-390, *et seq.*)**
**(On Behalf of the Georgia Sub-Class against all Defendants)**

391.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

392.   Plaintiff Jodie Chapman ("Georgia Plaintiff") brings this cause of action individually and on behalf of the Georgia Sub-Class against all Defendants.

393.   Georgia's Fair Business Practices Act ("GFBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. Ga. Code Ann. § 10-1-393(a).

394.   Unfair or deceptive acts or practices are defined to include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and [a]dvertising goods or services with intent not to sell them as

advertised." Ga. Code Ann. § 10-1-393(b). VW engaged in unfair and deceptive practices that violated the GFBPA as described above.

395.   VW participated in and engaged in deceptive business or trade practices prohibited by the GFBPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

396.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

397.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

398.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

399.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

400.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

401.   VW knew or should have known that its conduct violated the GFBPA.

402.   Georgia Plaintiff and the Georgia Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

403.   Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased

or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

404.    VW owed Georgia Plaintiff and the Georgia Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)    intentionally concealed the foregoing from Georgia Plaintiff and the Georgia Sub-Class Members; and/or

(c)     made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Georgia Plaintiff and the Georgia Sub-Class Members that contradicted these representations.

405.    Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Georgia Plaintiff and the Georgia Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle,

and that Class members would be required to bear the cost of the damage to their vehicles.

406.   Having volunteered to provide information to Georgia Plaintiff and the Georgia Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiff and the Georgia Sub-Class Members.

407.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Georgia Plaintiff and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

408.   Georgia Plaintiff and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Georgia Plaintiff and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

409.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

410.   Defendant's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

411.   As a proximate and direct result of VW's unfair and deceptive trade practices, Georgia Plaintiff and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

412.   Georgia Plaintiff provided notice of her claim by letter dated June 21, 2021.

Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against VW in the amount of damages, exemplary damages for intentional violations, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-399(a).

**EIGHTH CAUSE OF ACTION**
**(Violations of the Georgia Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. § 10-1-370, *et seq*.)**
**(On Behalf of the Georgia Sub-Class against all Defendants)**

413.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

414.   Georgia Plaintiff brings this cause of action individually and on behalf of the Georgia Sub-Class against all Defendants.

415.   The Georgia Uniform Deceptive Trade Practices Act ("GUDTPA") prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). VW engaged in unfair and deceptive practices that violated the GUDTPA as described above.

416.   VW, Georgia Plaintiff and the members of the Georgia Sub-Class are "persons" within the meaning of the GUDTPA, GA. Code Ann. § 10-1-471(5).

417.   VW participated in and engaged in deceptive business or trade practices prohibited by the GUDTPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

418.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

419.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

420.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

421.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

422.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

423.   VW knew or should have known that its conduct violated the GUDTPA.

424.   Georgia Plaintiff and the Georgia Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

425.   Had Georgia Plaintiff and the Georgia Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

426.   VW owed Georgia Plaintiff and the Georgia Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

136

(b)     intentionally concealed the foregoing from Georgia Plaintiff and the Georgia Sub-Class Members; and/or

(c)      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Georgia Plaintiff and the Georgia Sub-Class Members that contradicted these representations.

427.    Due to VW's specific and superior knowledge that the 2.0T Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Georgia Plaintiff and the Georgia Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

428.    Having volunteered to provide information to Georgia Plaintiff and the Georgia Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they

directly impact the value of the Class Vehicles purchased or leased by Georgia Plaintiff and the Georgia Sub-Class Members.

429.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Georgia Plaintiff and the Georgia Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

430.   Georgia Plaintiff and the Georgia Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Georgia Plaintiff and the Georgia Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

431.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Georgia Plaintiff and the Georgia Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

432.   Defendant's violations present a continuing risk to Georgia Plaintiff and the Georgia Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

433.   As a proximate and direct result of VW's unfair and deceptive trade practices, Georgia Plaintiff and members of the Georgia Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

434.   Georgia Plaintiff provided notice of her claims by letter dated June 21, 2021.

435.   Georgia Plaintiff and members of the Georgia Sub-Class seek monetary relief against VW in the amount of actual damages, injunctive relief, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment)
### (On Behalf of the Georgia Sub-Class against all Defendants)

436.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

437.   Georgia Plaintiff brings this cause of action individually and on behalf of the Georgia Sub-Class against all Defendants.

438.   VW has been unjustly enriched by Georgia Plaintiff and Class Members purchasing/leasing Class Vehicles from VW and purchasing replacement

parts and services from VW that Plaintiffs and Class Members would not have purchased/leased but for VW's misconduct alleged above with respect to the Piston Defect.

439.   Georgia Plaintiff and Georgia Sub-Class Members unknowingly conferred a benefit on VW of which VW had knowledge, since VW was aware of the defective nature of the Class Vehicles' 2.0T Engines, but failed to disclose this knowledge and misled Georgia Plaintiff and Georgia Sub-Class Members regarding the nature and quality of the Class Vehicles while profiting from this deception.

440.   The circumstances are such that it would be inequitable, unconscionable, and unjust to permit VW to retain the benefit of profits that it unfairly obtained from Georgia Plaintiff and Georgia Sub-Class Members. These profits include the premium price Georgia Plaintiff and Georgia Sub-Class Members paid for the Class Vehicles and the cost of the parts and services bought from VW to temporarily fix the defective engines.

441.   Georgia Plaintiff would consider purchasing or leasing similar VW vehicles in the future if Georgia Plaintiff could rely on VW's representations regarding the vehicles.

442.   Georgia Plaintiff and Georgia Sub-Class Members, having been damaged by VW's conduct, are entitled to recover or recoup damages as a result of the unjust enrichment of VW to their detriment.

## TENTH CAUSE OF ACTION
**(Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 ILCS 505/1, *et seq.*)**
**(On Behalf of the Illinois Sub-Class against all Defendants)**

443.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

444.   Plaintiff Carrie Vassel ("Illinois Plaintiff") brings this cause of action individually and on behalf of the Illinois Sub-Class against all Defendants.

445.   VW are "persons" as that term is defined in 815 ILCS 505/1(c).

446.   The Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

447.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits  "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. VW engaged in unfair and deceptive practices that violated the Illinois CFA as described above.

448.   VW participated in and engaged in deceptive business or trade practices prohibited by the Illinois CFA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

449.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Illinois Plaintiff and the Illinois Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

450.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

451.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

452.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

453.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

454.   VW knew or should have known that its conduct violated the Illinois CFA.

455.   Illinois Plaintiff and the Illinois Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

456.   Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

457.   VW owed Illinois Plaintiff and the Illinois Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)   intentionally concealed the foregoing from Illinois Plaintiff and the Illinois Sub-Class Members; and/or

(c)    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiff and the Illinois Sub-Class Members that contradicted these representations.

458.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Illinois Plaintiff and the Illinois Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

459.   Having volunteered to provide information to Illinois Plaintiff and the Illinois Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiff and the Illinois Sub-Class Members.

460.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Illinois Plaintiff and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

461.   Illinois Plaintiff and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

462.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

145

463.   Defendant's violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

464.   As a proximate and direct result of VW's unfair and deceptive trade practices, Illinois Plaintiff and members of the Illinois Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

465.   Illinois Plaintiff provided notice of her claim by letter dated June 8, 2021.

466.   The Illinois Plaintiff and members of the Illinois Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

467.   The Illinois Plaintiff and the Illinois Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, et seq.

## ELEVENTH CAUSE OF ACTION
### Breach of Express Warranty
### (Ill. Comp. Stat. §§ 5/2-313 and 5/2A-210)
### (On behalf of the Illinois Sub-Class against VWGoA)

468.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

469.   Illinois Plaintiff brings this cause of action individually and on behalf of the Illinois Sub-Class against VWGoA.

470.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

471.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

472.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

473.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Illinois law.

474.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

475.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

476.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

477.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Illinois Plaintiff's and Illinois Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

478.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members

had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

479.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

480.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

481.   Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Illinois Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

482.   In addition, on or about June 8, 2021, Illinois Plaintiff gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

483.   As a direct and proximate cause of the breach of express warranty by VWGoA, Illinois Plaintiff and the other Illinois Sub-Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff and the other Illinois Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

484.   Illinois Plaintiff and the other Illinois Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**TWELFTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212)**
**(On behalf of the Illinois Sub-Class against all Defendants)**

485.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

486.   Illinois Plaintiff brings this cause of action individually and on behalf of the Illinois Sub-Class against all Defendants.

487.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

488.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

489.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

490.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

491.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Illinois Plaintiff and the Illinois Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Illinois Plaintiff and the Illinois Sub-Class Members, with no modification to the defective engines.

492.   VW provided Illinois Plaintiff and Illinois Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

493.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

494.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Illinois Plaintiff and Illinois Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

495.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

496.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Illinois Plaintiff and Illinois Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

497.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

498.   Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

499.   Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Illinois Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

500.   In addition, on or about June 8, 2021, Illinois Plaintiff gave notice to Defendants that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

501.   Because Illinois Plaintiff purchased her vehicle from an authorized VW dealer, she is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required

where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

502.   As a direct and proximate cause of VW's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

503.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

### THIRTEENTH CAUSE OF ACTION
**(Violations of the Louisiana Product Liability Act,
LA. STAT. ANN. § 9:2800.51, *et seq.*)
(On Behalf of the Louisiana Sub-Class against all Defendants)**

504.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

505.   Plaintiff Karen Burnaugh ("Louisiana Plaintiff") brings this cause of action individually and on behalf of the Louisiana Sub-Class against all Defendants.

506.   Defendants are "manufacturers" within the meaning of La. Stat. Ann. § 9:2800.53(1).

507.   The Louisiana Plaintiff and the Louisiana Sub-Class members are "claimants" as that term is defined in La. Stat. Ann. § 9:2800.53(4).

508.   Defendants placed the Class Vehicles into trade or commerce, which are "products" within the meaning of La. Stat. Ann. § 9:2800.53(3).

509.   The Louisiana Product Liability Act ("LPLA") makes manufacturers liable for the damages caused by their products which are "unreasonably dangerous" in one of four ways: (1) in construction or composition; (2) design; (3) inadequate warning; and (4) nonconformity to express warranty. La. Stat. Ann. § 9:2800.55-58.

510.   Defendants manufactured, sold, and distributed the Class Vehicles, including the pistons and piston rings and their defects, which render the Class Vehicles unreasonably dangerous with an associated safety risk which can lead the Class Vehicles to lose power while driving, putting vehicle operators, passengers, and other motorists at risk for injury.  Louisiana Plaintiff and the Louisiana Sub-Class used the Class Vehicles in a reasonably foreseeable manner by using the vehicles to transport themselves and others.

511.   The pistons and/or piston rings installed in the engines of the Class Vehicles are unreasonable dangerous in construction or composition because they deform, crack, fracture, and degrade when exposed to pressure and temperature of the engines while in motion.  The pistons and/or pistons rings do not meet performance standards for pistons and/or piston rings in any vehicle because they

begin to fail before 75,000 miles and deviate materially from manufacturer specifications. Furthermore, the Piston Defect and its associated safety risk put drivers, passengers, and other motorists at risk for injury due to a sudden loss of power while driving, which can increase the likelihood of collisions. The performance standards for pistons and/or piston rings do not include the risk that they will allow for engine oil to enter the combustion chamber due to deforming, cracking, fracturing, and/or degrading before 75,000 miles have been driven on the engine or and Defendants' specifications for the Class Vehicles do not include such a risk.

512. The Class Vehicles are unreasonably dangerous due to the Piston Defect and Defendants' failure to disclose the Piston Defect as well as its associated safety risk to Louisiana Plaintiff and the Louisiana Sub-Class. At the time Louisiana Plaintiff and the Louisiana Sub-Class purchased their Class Vehicles, Defendants knew, or should have known, that the Piston Defect in the Class Vehicles would case the engine to consume excessive oil, stall, and lose power. Further, Defendants knew, or should have known, that this associated safety risk would cause the Class Vehicles to become involved in accidents, putting drivers, passengers, and other motorists at risk for injury. However, Defendants provided no warnings or otherwise conveyed these risks to Louisiana Plaintiff and the Louisiana Sub-Class.

513.   The Class Vehicles are also unreasonably dangerous because the existence of the Piston Defect and its associated safety risk, and Defendants' failure to disclose either violates the express warranty Defendants provided that the Class Vehicles were safe, reliable, and functional vehicles capable of providing transportation and that defendants' warranties would correct any known defects in the Class Vehicle' materials and/or workmanship.   Such warranties induced Louisiana Plaintiff and the Louisiana Sub-Class to purchase the Class Vehicles. These representations were untrue at the time of the purchase and/or lease of the Class Vehicles because Defendants knew that the Class Vehicles contained the Piston Defect and its associated safety risk and further knew they would not honor the warranty for the Piston Defect by disclaiming its existence within the time and durational limitations of their express warranties.   Defendants' failure to provide Class Vehicles that conformed with their representations lead to the injuries sustained by Louisiana Plaintiff and the Louisiana Sub-Class.

514.   Defendants knowingly concealed, suppressed, and/or omitted the existence of the Piston Defect and its associated safety risk in the Class Vehicles at the time of their sale or lease and at all relevant times thereafter.   Defendants failed to inform Louisiana Plaintiff and the Louisiana Sub-Class of the Piston Defect in their Class Vehicles at the time of purchase or lease and all times thereafter and

Louisiana Plaintiff and the Louisiana Sub-Class had no independent knowledge that the Class Vehicles incorporate the Piston Defect.

515.   Had Defendants disclosed that the Class Vehicles had the Piston Defect and associated safety risk, Louisiana Plaintiff and the Louisiana Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

516.   As a proximate and direct result of Defendants' conduct as a described herein, Louisiana Plaintiff and the Louisiana Sub-Class have suffered and continue to suffer harm by the loss of their vehicles, the threat of sudden engine stalls or failures, paying for replacement pistons, piston rings, and/or engines, and/or higher than expected maintenance costs based on Defendants' own estimates, particularly with respect to oil purchases, and other damages to be determined at trial.  Louisiana Plaintiff and the Louisiana Sub-Class have also suffered the ascertainable loss of the benefit of the bargain they reached at the time of purchase or lease, and the diminished value of their Class Vehicles.

517.   The conduct of Defendants caused unavoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided injury due to no fault of their own and Defendants' concealment of the Piston Defect) without any countervailing benefit to consumers.

518.   The applicable period of prescription of the LPLA has been tolled by the discovery rule, fraudulent concealment, and the terms of the express warranty.

519.   Pursuant to La. Civ. Ann. Art. 2315, Louisiana Plaintiff and the Louisiana Sub-Class seek to recover compensatory damages for past and future harms in an amount to determined at trial, and any other just and proper relief available.

**FOURTEENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability/ Warranty Against**
**Redhibitory Defects**
**(LA. CIV. CODE ART. 2520, 2524)**
**(On behalf of the Louisiana Sub-Class against all Defendants)**

520.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

521.   Louisiana Plaintiff brings this cause of action individually and on behalf of the Louisiana Sub-Class against all Defendants.

522.   Defendants are and were at all relevant times each a "merchant" with respect to motor vehicles under La. Civ. Code Art. 2520, 2524.

523.   Under La. Civ. Code Art. 2520 and 2524, a warranty that the Class Vehicles did not have redhibitory defects was implied by law in the transactions when Louisiana Plaintiff and the Louisiana Sub-Class Members purchased or leased their Class Vehicles from VW.

524.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles

equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Louisiana Plaintiff and the Louisiana Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Louisiana Plaintiff and the Louisiana Sub-Class Members, with no modification to the defective engines.

525.   VW provided Louisiana Plaintiff and Louisiana Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

526.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

527.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Louisiana Plaintiff and Louisiana Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

528.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

529.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Louisiana Plaintiff and Louisiana Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

530.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of La. Civ. Code Art. 2520 and 2524.

531.   Louisiana Plaintiff and the Louisiana Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

532.   Louisiana Plaintiff and the Louisiana Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Louisiana Plaintiff also provided notice when she presented her vehicle for repair at an authorized dealer.

533.   Because Louisiana Plaintiff purchased her vehicle from an authorized VW dealer, she is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

534.   As a direct and proximate cause of VW's breach, Louisiana Plaintiff and the Louisiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Louisiana Plaintiff and the Louisiana Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

535.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Louisiana Plaintiff and the Louisiana Sub-Class Members have been damaged in an amount to be proven at trial.

### FIFTEENTH CAUSE OF ACTION
**(Violations of the Minnesota Prevention of Consumer Fraud Act, MINN. STAT. § 325F.68, *et seq*.)**
**(On Behalf of the Minnesota Sub-Class against all Defendants)**

536.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

537.   Plaintiff Tom Garden ("Minnesota Plaintiff") brings this cause of action individually and on behalf of the Minnesota Sub-Class against all Defendants.

538.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

539.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …." Minn. Stat. § 3 25F.69(1). VW engaged in unfair and deceptive practices that violated the Minnesota CFA as described above.

540.   VW participated in and engaged in deceptive business or trade practices prohibited by the Minnesota CFA by failing to disclose and actively concealing the

defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

541.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

542.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

543.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

544.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

545.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

546.   VW knew or should have known that its conduct violated the Minnesota CFA.

547.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

548.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

549.   VW owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)     possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)     intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

(c)      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

550.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

551.   Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because

166

they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members.

552.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

553.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

554.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

555.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

556.   As a proximate and direct result of VW's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

557.   Pursuant to Minn. Stat. § 8.31(3a), Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota CFA.

558.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that VW's acts show deliberate disregard for the rights or safety of others.

## SIXTEENTH CAUSE OF ACTION
### (Violations of the Minnesota Uniform Deceptive Trade Practices Act, MINN. STAT. § 325D.43-48, *et seq.*)
### (On Behalf of the Minnesota Sub-Class against all Defendants)

559.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

560.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class against all Defendants.

561.   The Class Vehicles constitute "merchandise" within the meaning of Minn. Stat. § 325F.68.

562.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44. VW engaged in unfair and deceptive practices that violated the Minnesota DTPA as described above.

563.   VW participated in and engaged in deceptive business or trade practices prohibited by the Minnesota DTPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

564.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and

of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

565.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

566.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

567.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

568.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

569.   VW knew or should have known that its conduct violated the Minnesota DTPA.

570.   Minnesota Plaintiff and the Minnesota Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

571.   Had Minnesota Plaintiff and the Minnesota Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

572.   VW owed Minnesota Plaintiff and the Minnesota Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)   intentionally concealed the foregoing from Minnesota Plaintiff and the Minnesota Sub-Class Members; and/or

(c)   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Minnesota Plaintiff and the Minnesota Sub-Class Members that contradicted these representations.

573.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Minnesota Plaintiff and the Minnesota Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

574.   Having volunteered to provide information to Minnesota Plaintiff and the Minnesota Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Minnesota Plaintiff and the Minnesota Sub-Class Members.

575.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Minnesota Plaintiff and the Minnesota Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and

superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

576.   Minnesota Plaintiff and the Minnesota Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Minnesota Plaintiff and the Minnesota Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

577.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

578.   Defendant's violations present a continuing risk to Minnesota Plaintiff and the Minnesota Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

579.   As a proximate and direct result of VW's unfair and deceptive trade practices, Minnesota Plaintiff and members of the Minnesota Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

580.   Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Minnesota Plaintiff and the Minnesota Sub-Class Members seek damages in an amount to be proven at trial, including but not limited to actual damages and attorneys' fees, under the Minnesota DTPA.

581.   Minnesota Plaintiff and the Minnesota Sub-Class Members also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that VW's acts show deliberate disregard for the rights or safety of others.

**SEVENTEENTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(MINN. STAT. §336.2-313 AND 336.2A-210)**
**(On behalf of the Minnesota Sub-Class against VWGoA)**

582.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

583.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class against VWGoA.

584.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

585.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

586.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

587.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Minnesota law.

588.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

589.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

590.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

591.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T

Engines and components. By simply replacing Minnesota Plaintiff's and Minnesota Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

592.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Minnesota Plaintiff and the Minnesota Sub-Class Members. Among other things, Minnesota Plaintiff and the Minnesota Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

593.   Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

594.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

595.   Minnesota Plaintiff and Minnesota Sub-Class Members were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty

would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Minnesota Plaintiff and Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources. Minnesota Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

596.   As a direct and proximate cause of the breach of express warranty by VWGoA, Minnesota Plaintiff and the Minnesota Sub-Class have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

597.   Minnesota Plaintiff and the Minnesota Sub-Class are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### EIGHTEENTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(Minn. Stat. §§ 336.2-314 and 336.2A-212)**
**(On behalf of the Minnesota Sub-Class against all Defendants)**

598.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

599.   Minnesota Plaintiff brings this cause of action individually and on behalf of the Minnesota Sub-Class against all Defendants.

600.   Defendants are and were each at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. §§ 336.2-104(1) and a "seller" of motor vehicles under Minn. Stat. § 336.2-103(1)(d).

601.   With respect to leases, Defendants are and were each at all relevant times a "lessor" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

602.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. §§ 336.2-105(1) and 336.2A-103(1)(h).

603.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Minn. Stat. §§ 336.2-314 and 336.2A-212.

604.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Minnesota Plaintiff and the Minnesota Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Minnesota Plaintiff and the Minnesota Sub-Class Members, with no modification to the defective engines.

605.   VW provided Minnesota Plaintiff and Minnesota Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are

merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

606.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

607.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Minnesota Plaintiff and Minnesota Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

608.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

609.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money,

property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Minnesota Plaintiff and Minnesota Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

610.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

611.   Minnesota Plaintiff and the Minnesota Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

612.   Minnesota Plaintiff and the Minnesota Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Minnesota Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

613.   Because Minnesota Plaintiff purchased his vehicle from an authorized VW dealer, he is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not

required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

614.   As a direct and proximate cause of VW's breach, Minnesota Plaintiff and the Minnesota Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Minnesota Plaintiff and the Minnesota Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

615.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Minnesota Plaintiff and the Minnesota Sub-Class Members have been damaged in an amount to be proven at trial.

## NINETEENTH CAUSE OF ACTION
### (Violations of the Nevada Deceptive Trade Practices Act, (Nev. Rev. Stat. § 598.0903, *et seq*.) (On Behalf of the Nevada Sub-Class against all Defendants)

616.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

617.   Plaintiffs Ada Gozon and Angeli Gozon ("Nevada Plaintiffs") bring this cause of action individually and on behalf of the Nevada Sub-Class against all Defendants.

618.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et. seq*., prohibits the use of deceptive trade practices in the

181

course of business and occupation.  Under Nevada law, deceptive trade practices include, but are not limited to, "[k]nowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease" or "[r]epresenting that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model."  Nev. Rev. Stat. Ann. § 598.0915(5), (7).  See also Nev. Rev. Stat. Ann. § 598.0915(9), (15), Nev. Rev. Stat. Ann. § 598.0925.

619.   VW engaged in unfair and deceptive practices that violated the Nevada DTPA as described above.

620.   VW participated in and engaged in deceptive business or trade practices prohibited by the Nevada DTPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

621.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were

sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

622.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

623.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

624.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

625.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

626.   VW knew or should have known that its conduct violated the Nevada DTPA.

627.   Nevada Plaintiffs and the Nevada Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

628.   Had Nevada Plaintiffs and the Nevada Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

629.   VW owed Nevada Plaintiffs and the Nevada Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)   intentionally concealed the foregoing from Nevada Plaintiffs and the Nevada Sub-Class Members; and/or

(c)   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Nevada Plaintiffs and the Nevada Sub-Class Members that contradicted these representations.

630.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class

Vehicles, and reliance by Nevada Plaintiffs and the Nevada Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

631.   Having volunteered to provide information to Nevada Plaintiffs and the Nevada Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Nevada Plaintiffs and the Nevada Sub-Class Members.

632.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Nevada Plaintiffs and the Nevada Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

633.   Nevada Plaintiffs and the Nevada Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Nevada Plaintiffs

and the Nevada Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

634.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Nevada Plaintiffs and the Nevada Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

635.   Defendant's violations present a continuing risk to Nevada Plaintiffs and the Nevada Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

636.   As a proximate and direct result of VW's unfair and deceptive trade practices, Nevada Plaintiffs and members of the Nevada Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

637.   Pursuant to Nev. Rev. Stat. §§ 41.600, the Nevada Plaintiffs and Nevada Sub-Class Members seek an order enjoining Defendants' unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Nevada DTPA.

## TWENTIETH CAUSE OF ACTION
**Breach of Express Warranty**
**(Nev. Rev. Stat. §§ 104.2313 and 104A.2210)**
**(On behalf of the Nevada Sub-Class against VWGoA)**

638.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

639.   Nevada Plaintiffs brings this cause of action individually and on behalf of the Nevada Sub-Class against VWGoA.

640.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

641.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

642.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

643.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Nevada law.

644.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

645.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

646.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

647.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Nevada Plaintiff's and Nevada Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

648.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Nevada Plaintiffs and the Nevada Sub-Class Members. Among other things, Nevada Plaintiffs and the Nevada Sub-Class

Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

649.   Nevada Plaintiffs and the Nevada Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

650.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

651.   Nevada Plaintiffs and Nevada Sub-Class Members were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Nevada Plaintiffs also provided notice when they presented their vehicle for repair at an authorized dealer.

652.   As a direct and proximate cause of the breach of express warranty by VWGoA, Nevada Plaintiffs and Nevada Sub-Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or

lease. Additionally, Nevada Plaintiffs and Nevada Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

653.   Nevada Plaintiffs and Nevada Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**NINETEENTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(Nev. Rev. Stat. §§ 104.2314 and 104A.2212)**
**(On behalf of the Nevada Sub-Class against all Defendants)**

654.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

655.   Nevada Plaintiffs brings this cause of action individually and on behalf of the Nevada Sub-Class against all Defendants.

656.   Defendants are and were each at all relevant times a "merchant" with respect to motor vehicles under Nev. Rev. Stat. §§ 104.2104(1) and 104A.2103(3), and "sellers" of motor vehicles under § 104.2103(1)(c).

657.   With respect to leases, Defendants are and were each at all relevant times a "lessor" of motor vehicles under Nev. Rev. Stat. § 104A.2103(1)(p).

658.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Nev. Rev. Stat. §§ 104.2105(1) and 104A.2103(1)(h).

659.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

660.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Nevada Plaintiffs and the Nevada Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Nevada Plaintiffs and the Nevada Sub-Class Members, with no modification to the defective engines.

661.   VW provided Nevada Plaintiffs and Nevada Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

662.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other

things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

663.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Nevada Plaintiffs and Nevada Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

664.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

665.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Nevada Plaintiffs and Nevada Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

666.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Nev. Rev. Stat. §§ 104.2314 and 104A.2212.

667.   Nevada Plaintiffs and the Nevada Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

668.   Nevada Plaintiffs and the Nevada Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Nevada Plaintiffs also provided notice when they presented their vehicle for repair at an authorized dealer.

669.   Because Nevada Plaintiffs purchased their vehicle from authorized VW dealer, they are in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

670.   As a direct and proximate cause of VW's breach, Nevada Plaintiffs and the Nevada Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Nevada Plaintiffs and the Nevada Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

671.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Nevada Plaintiffs and the Nevada Sub-Class Members have been damaged in an amount to be proven at trial.

## TWENTY-SECOND CAUSE OF ACTION
### (Violations of the New Jersey Consumer Fraud Act, N.J.S.A. §§ 56:8-1, et seq.) (On Behalf of the New Jersey Sub-Class against all Defendants)

672.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

673.   Plaintiff Gonzalez ("New Jersey Plaintiff") brings this cause of action individually and on behalf of the New Jersey Sub-Class against all Defendants.

674.   VW, New Jersey Plaintiff, and New Jersey Sub-Class Members are "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J.S.A. § 56:8-1(d).

675.   VW engaged in "sales" of "merchandise" within the meaning of N.J. Stat. § 56:8-1(c), (d).

676.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any

merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J.S.A. § 56:8-2. VW engaged in unfair and deceptive practices that violated the New Jersey CFA as described above.

677.   VW participated in and engaged in deceptive business or trade practices prohibited by the New Jersey CFA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

678.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused New Jersey Plaintiff and the New Jersey Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate

relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

679. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

680. VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

681. VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

682. VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

683. VW knew or should have known that its conduct violated the New Jersey CFA.

684. New Jersey Plaintiff and the New Jersey Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

685.   Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

686.   VW owed New Jersey Plaintiff and the New Jersey Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

687.   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

688.   intentionally concealed the foregoing from New Jersey Plaintiff and the New Jersey Sub-Class Members; and/or

689.   made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from New Jersey Plaintiff and the New Jersey Sub-Class Members that contradicted these representations.

690.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by New Jersey Plaintiff and the New Jersey Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class

Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

691.   Having volunteered to provide information to New Jersey Plaintiff and the New Jersey Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by New Jersey Plaintiff and the New Jersey Sub-Class Members.

692.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to New Jersey Plaintiff and the New Jersey Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

693.   New Jersey Plaintiff and the New Jersey Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, New Jersey Plaintiff and the New Jersey Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

694.   As a direct and proximate result of VW's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

695.   Defendant's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

696.   As a proximate and direct result of VW's unfair and deceptive trade practices, New Jersey Plaintiff and members of the New Jersey Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

697.   New Jersey Plaintiff and members of the New Jersey Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

698.   Pursuant to N.J.S.A. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub-Class Members seek an order enjoining VW's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

**TWENTY-THIRD CAUSE OF ACTION**
**(Violations of the New Jersey Truth-in-Consumer,**
**Contract, Warranty and Notice Act,**
**N.J.S.A. §§ 56:12-14, *et seq*.)**
**(On Behalf of the New Jersey Sub-Class against all Defendants)**

699.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

700.   New Jersey Plaintiff brings this cause of action individually and on behalf of the New Jersey Sub-Class against all Defendants.

701.   New Jersey Plaintiff and New Jersey Sub-Class Members are "consumers" within the meaning of N.J.S.A. 56:12-15.

702.   New Jersey Plaintiff and New Jersey Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family, or household purposes.

703.   VW is a seller within the meaning of N.J.S.A. 56:12-15 and -17.

704.   The New Jersey Truth-in-Consumer, Contract, Warranty and Notice Act ("TCCWNA"), provides in relevant part that "no seller, creditor, lender or bailee may offer or enter into any written consumer contract or give or display any notice which includes any provision that violates a clearly established right of the consumer or responsibility of the seller, lessor, creditor, lender or bailee as established by State or Federal law at the time the offer is made or the consumer contract is signed or the warranty, notice or sign is given or displayed." N.J.S.A. 56:12-15.

705.   VW violated the TCCWNA by violating the NJ CFA and a clearly established legal right of a consumer and/or responsibility of the seller to not engage

in any misrepresentations, deception, or unconscionable commercial conduct in connection with consumer sales as detailed herein.

706.    As the result of VW's violations of the TCCWNA, New Jersey Plaintiff and the New Jersey Sub-Class Members are entitled to statutory damages of not less than $100 each, as well as reasonable attorneys' fees and court costs, as provided by N.J.S.A. 56:12-17.

**TWENTY-FOURTH CAUSE OF ACTION**
**Breach of Express Warranty**
**(N.J.S.A. §§ 12A:2-313 and 2A-210)**
**(On behalf of the New Jersey Sub-Class against VWGoA)**

707.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

708.  New Jersey Plaintiff brings this cause of action individually and on behalf of the New Jersey Sub-Class against VWGoA.

709.  VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S.A. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

710.  With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under N.J.S.A.§ 12A:2A-103(1)(p).

711.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S.A.§§ 12A:2-105(1) and 2A-103(1)(h).

712.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under New Jersey law.

713.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

714.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

715.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

716.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T

Engines and components. By simply replacing New Jersey Plaintiff's and New Jersey Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

717.  The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect New Jersey Plaintiff and the New Jersey Sub-Class Members. Among other things, New Jersey Plaintiff and the New Jersey Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the New Jersey Sub-Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

718.  New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

719.  Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

720.  New Jersey Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to

cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Plaintiff and Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources. New Jersey Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

721.   In addition, via letter dated July 23, 2021, New Jersey Plaintiff gave notice to Defendants, that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

722.   As a direct and proximate cause of the breach of express warranty by VWGoA, New Jersey Plaintiff and the other New Jersey Sub-Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, New Jersey Plaintiff and the other New Jersey Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

723.   New Jersey Plaintiff and the other New Jersey Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### FOURTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability**
**(N.J.S.A. §§ 12A:2-314 and 2A-212)**
**(On behalf of the New Jersey Sub-Class Against all Defendants)**

724.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-147 of this Complaint.

725.   New Jersey Plaintiff brings this cause of action individually and on behalf of the New Jersey Sub-Class against all Defendants.

726.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under N.J.S.A. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

727.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under N.J.S.A.§ 12A:2A-103(1)(p).

728.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J.S.A.§§ 12A:2-105(1) and 2A-103(1)(h).

729.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J.S.A. §§ 12A:2-314 and 2A-212

730.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom New Jersey Plaintiff and the New Jersey Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles.

VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and the New Jersey Sub-Class Members, with no modification to the defective engines.

731.   VW provided New Jersey Plaintiff and New Jersey Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

732.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

733.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing New Jersey Plaintiff and New Jersey Sub-Class

members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

734.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

735.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, New Jersey Plaintiff and New Jersey Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

736.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.J.S.A. §§ 12A:2-314 and 2A-212.

737.   New Jersey Plaintiff and the New Jersey Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

738.   New Jersey Plaintiff and the New Jersey Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from New

Jersey Plaintiff and the New Jersey Sub-Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  New Jersey Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

739.   In addition, via letter dated July 23, 2021, New Jersey Plaintiff gave notice to Defendants, that he intended to pursue his warranty claims on behalf of a class of similarly situated consumers.

740.   Because New Jersey Plaintiff purchased his vehicle from an authorized VW dealer, he is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

741.   As a direct and proximate cause of VW's breach, New Jersey Plaintiff and the New Jersey Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and the New Jersey Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

742.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, New Jersey Plaintiff and the New Jersey Sub-Class Members have been damaged in an amount to be proven at trial.

### TWENTY-FIFTH CAUSE OF ACTION
**(Violation Of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.)**
**(On Behalf of the New Jersey Sub-Class, against all Defendants)**

743.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

744.   New Jersey Plaintiff brings this cause of action individually and on behalf of the New Jersey Sub-Class.

745.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332(a) and (d).

746.   New Jersey Plaintiff and the New Jersey Sub-Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

747.   VW is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. 2301(4)-(5).

748.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

749.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

750.   In its Limited Warranty, VW expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects became apparent during the warranty period.

751.   VW's Limited Warranty is a written warranty within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. 2301(7).

752.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of VW's written warranty and implied warranty became part of the basis of the bargain between VW, on the one hand, and New Jersey Plaintiff and each of the members of the proposed New Jersey Sub-Class, on the other.

753.   VW breached the implied warranty of merchantability. Without limitation, the Class Vehicles have piston rings that do not seat properly in the grooves of the piston head in the 2.0T Engine, which can cause the pistons and the engine itself to fail at any time,, as described above, and which thus render the Class Vehicles unmerchantable.

754.   VW breached its express Limited Warranty by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead,

replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components.

755.   New Jersey Plaintiff, individually and on behalf of the members of the proposed New Jersey Sub-Class, notified VW of the Piston Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter dated and mailed July 23, 2021.

756.   New Jersey Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer. VW was also provided notice of the defect through thousands of consumer complaints and information about service repairs from its dealerships. VW has not remedied the breach.

757.   Further, VW has refused to provide an adequate warranty repair for the Piston Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to the Piston Defect VW dealers either, informed them that their vehicles are functioning properly, conduct repairs that merely mask the Piston Defect, or fail to provide service stating that such damage is not covered under warranty.

758.   At the time of sale or lease of each Class Vehicle, VW knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Piston Defect. Under the circumstances, the remedies available under any

informal settlement procedure would be inadequate, and any requirement that New Jersey Plaintiff and the members of the proposed Classes and Subclasses resort to an informal dispute resolution procedure and/or afford VW a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

759.   The amount in controversy of New Jersey Plaintiff's individual claims meet or exceed the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

760.   As a direct and proximate result of VW's breaches of its Limited Warranty and the implied warranty of merchantability, New Jersey Plaintiff and the members of the proposed New Jersey Sub-Class have sustained damages in an amount to be determined at trial.

761.   New Jersey Plaintiff, individually and on behalf of all members of the proposed New Jersey Sub-Class, seek all damages permitted by law, including the diminution in value of their vehicles, in an amount to be proven at trial.

**TWENTY-SIXTH CAUSE OF ACTION**
**(Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**
**73 P.S. § 201-1,, *et seq.*)**
**(On Behalf of the Pennsylvania Sub-Class against all Defendants)**

762.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

763.   Plaintiffs Clydiene Francis and Particia Hensley ("Pennsylvania Plaintiffs") bring this cause of action individually and on behalf of the Pennsylvania Sub-Class against all Defendants.

764.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members purchased or leased their Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

765.   All of the acts complained of herein were perpetrated by VW in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

766.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). VW engaged in unfair and deceptive practices that violated the Pennsylvania CPL as described above.

767.   VW participated in and engaged in deceptive business or trade practices prohibited by the Pennsylvania CPL by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class

Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

768.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Georgia Plaintiff and the Georgia Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

769.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

770.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

214

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

771.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

772.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

773.   VW knew or should have known that its conduct violated the Pennsylvania CPL.

774.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

775.   Had Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

776.   VW owed Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)  possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)  intentionally concealed the foregoing from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members; and/or

(c)  made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members that contradicted these representations.

777.  Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

778.  Having volunteered to provide information to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material

because they directly impact the value of the Class Vehicles purchased or leased by Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members.

779.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

780.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

781.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

782.   Defendant's violations present a continuing risk to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

783.   As a proximate and direct result of VW's unfair and deceptive trade practices, Pennsylvania Plaintiffs and members of the Pennsylvania Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

784.   Pennsylvania Plaintiff Francis provided notice of her claim by letter dated June 21, 2021.

785.   VW is liable to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a). Pennsylvania Plaintiffs and the Pennsylvania Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

### TWENTY-SEVENTH CAUSE OF ACTION
**Breach of Express Warranty**
**(13 PA. CONS. STAT. §§ 2313 AND 2A210)**
**(On behalf of the Pennsylvania Sub-Class against VWGoA)**

786.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

787.   Pennsylvania Plaintiffs bring this cause of action individually and on behalf of the Pennsylvania Sub-Class against VWGoA.

788.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

789.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

790.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

791.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Pennsylvania law.

792.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

793.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or

adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

794. According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

795. VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Pennsylvania Plaintiff's and Pennsylvania Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

796. The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members. Among other things, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

797. Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

798. Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

799. Pennsylvania Plaintiffs and Pennsylvania Sub-Class Members were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Pennsylvania Plaintiffs also provided notice when they presented their vehicles for repair at authorized dealers.

800. In addition, on or about June 21, 2021, Pennsylvania Plaintiff Francis gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

801. As a direct and proximate cause of the breach of express warranty by VWGoA, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class have suffered,

and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

802.    Pennsylvania Plaintiffs and the Pennsylvania Sub-Class are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**TWENTY-EIGHTH CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(13 PA. CONS. STAT. §§ 2314 AND 2A212)**
**(On behalf of the Pennsylvania Sub-Class against all Defendants)**

803.  Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

804.    Pennsylvania Plaintiffs bring this cause of action individually and on behalf of the Pennsylvania Sub-Class against all Defendants.

805.    Defendants are and were each at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

806.    With respect to leases, Defendants are and were each at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

807.   The Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

808.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

809.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members, with no modification to the defective engines.

810.   VW provided Pennsylvania Plaintiffs and Pennsylvania Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter

and are not fit for their particular purpose of providing safe and reliable transportation.

811.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

812.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Pennsylvania Plaintiffs and Pennsylvania Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

813.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

814.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Pennsylvania Plaintiffs and Pennsylvania Sub-Class members were harmed

and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

815.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 13 Pa. Cons. Stat. §§ 2314 and 2A212.

816.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

817.   Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Pennsylvania Plaintiffs also provided notice when they presented their vehicles for repair at authorized dealers.

818.   In addition, on or about June 21, 2021, Pennsylvania Plaintiff Francis gave notice to Defendants that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

819.   Because Pennsylvania Plaintiff Francis purchased her vehicle from an authorized VW dealer, she is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

820.   As a direct and proximate cause of VW's breach, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

821.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Pennsylvania Plaintiffs and the Pennsylvania Sub-Class Members have been damaged in an amount to be proven at trial.

### TWENTY-NINTH CAUSE OF ACTION
**(Violations of the Texas Deceptive Trade Practices Act –**
**Consumer Protection Act,**
**TEXAS BUS. & COM. CODE § 17.41, *et seq*.)**
**(On Behalf of the Texas Sub-Class against all Defendants)**

822.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

823.   Plaintiffs Peter Lowegard and Gunnel Lowegard ("Texas Plaintiffs") bring this cause of action individually and on behalf of the Texas Sub-Class against all Defendants.

824.   Each Defendant is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

825.   The Texas Plaintiffs and the Texas Sub-Class members are individuals, partnerships or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), see Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

826.   Defendants are each engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

827.   The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). VW engaged in unfair and deceptive practices that violated the Texas DTPA as described above.

828.   VW participated in and engaged in deceptive business or trade practices prohibited by the Texas DTPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

829.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Texas Plaintiffs and the Texas Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

830.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

831.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

832.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

833.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

834.   VW knew or should have known that its conduct violated the Texas DTPA.

835.   Texas Plaintiffs and the Texas Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

836.   Had Texas Plaintiffs and the Texas Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

837.   VW owed Texas Plaintiffs and the Texas Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)   possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)   intentionally concealed the foregoing from Texas Plaintiffs and the Texas Sub-Class Members; and/or

(c)    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Texas Plaintiffs and the Texas Sub-Class Members that contradicted these representations.

838.   Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Texas Plaintiffs and the Texas Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

839.   Having volunteered to provide information to Texas Plaintiffs and the Texas Sub-Class Members, VW had the duty to disclose not just the partial truth,

but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Texas Plaintiffs and the Texas Sub-Class Members.

840.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Texas Plaintiffs and the Texas Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

841.   Texas Plaintiffs and the Texas Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Texas Plaintiffs and the Texas Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

842.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Texas Plaintiffs and the Texas Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

843.   Defendant's violations present a continuing risk to Texas Plaintiffs and the Texas Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

844.   As a proximate and direct result of VW's unfair and deceptive trade practices, Texas Plaintiffs and members of the Texas Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

845.   Texas Plaintiffs provided notice of their claims by letter dated June 21, 2021.

846.   Pursuant to Tex. Bus. & Com. Code § 17.50, Texas Plaintiffs and the Texas Sub-Class Members seek an order enjoining VW from engaging in unfair and/or deceptive acts or practices, damages, multiple damages for knowing and intentional violations, pursuant to § 17.50(b)(1), punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

**THIRTIETH CAUSE OF ACTION**
**Breach of Express Warranty**
**(TEX. BUS. & COM. CODE §§ 2.313 AND 2A.210)**
**(On behalf of the Texas Sub-Class against VWGoA)**

847.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

848.   Texas Plaintiffs brings this cause of action individually and on behalf of the Texas Sub-Class against VWGoA.

849.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

850.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

851.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

852.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Texas law.

853.   The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

854.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

855.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

856.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Texas Plaintiff's and Texas Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

857.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Texas Plaintiffs and the Texas Sub-Class Members. Among other things, Texas Plaintiffs and the Texas Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

858.   Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

859.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

860.   Texas Plaintiffs and Texas Sub-Class Members were not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Texas Plaintiffs also provided notice when they presented their vehicle for repair at an authorized dealer.

861.   In addition, on or about June 21, 2021, Texas Plaintiffs gave notice to Defendant that they intended to pursue their warranty claims on behalf of a class of similarly situated consumers.

862.   As a direct and proximate cause of the breach of express warranty by VWGoA, Texas Plaintiffs and Texas Sub-Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Texas Plaintiffs and Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

863.   Texas Plaintiffs and Texas Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**THIRTY-FIRST CAUSE OF ACTION**
**Breach of the Implied Warranty of Merchantability**
**(TEX. BUS. & COM. CODE §§ 2.314 AND 2A.212)**
**(On behalf of the Texas Sub-Class against all Defendants)**

864.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

865.   Texas Plaintiffs brings this cause of action individually and on behalf of the Texas Sub-Class against all Defendants.

866.   Defendants are and were each at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

867.   With respect to leases, Defendants are and were each at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

868.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

869.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

870.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Texas Plaintiffs and the Texas Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiffs and the Texas Sub-Class Members, with no modification to the defective engines.

871.   VW provided Texas Plaintiffs and Texas Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

872.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and

reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

873. Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Texas Plaintiffs and Texas Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

874. The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

875. As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Texas Plaintiffs and Texas Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

876. VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Texas Bus. & Com. Code §§ 2.314 and 2A.212.

877.   Texas Plaintiffs and the Texas Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

878.   Texas Plaintiffs and the Texas Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources. Texas Plaintiffs also provided notice when they presented their vehicle for repair at an authorized dealer.

879.   In addition, on or about June 21, 2021, Texas Plaintiffs gave notice to Defendants that they intended to pursue their warranty claims on behalf of a class of similarly situated consumers.

880.   Because Texas Plaintiffs purchased their vehicle from authorized VW dealer, they are in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

881.   As a direct and proximate cause of VW's breach, Texas Plaintiffs and the Texas Sub-Class Members suffered damages and continue to suffer damages,

including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiffs and the Texas Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

882.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Texas Plaintiffs and the Texas Sub-Class Members have been damaged in an amount to be proven at trial.

### THIRTY-SECOND CAUSE OF ACTION
**(Violations of the Washington Consumer Protection Act,
WASH REV. CODE § 19.86.010, *et seq.*)
(On Behalf of the Washington Sub-Class against all Defendants)**

883.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

884.   Plaintiff Grant Bradley ("Washington Plaintiff") brings this cause of action individually and on behalf of the Washington Sub-Class against all Defendants.

885.   Washington Plaintiff, the Washington Sub-Class, and all Defendants are "persons" as that term is defined in Wash. Rev. Code § 19.86.010(2).

886.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.96.010.

887.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. VW engaged in unfair and deceptive practices that violated the Washington CPA as described above.

888.   VW participated in and engaged in deceptive business or trade practices prohibited by the Washington CPA by failing to disclose and actively concealing the defective nature of the pistons within the 2.0T Engine, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold.

889.   By failing to disclose the Piston Defect; by concealing the Piston Defect; by promoting and selling or leasing Class Vehicles it knew were defective, including by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality; by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold; by failing to make repairs or making repairs and providing replacements that caused Washington Plaintiff and the Washington Sub-Class Members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and by minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles.

890.   VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Piston Defect in the course of its business.

891.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

892.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

893.   VW knew that the Class Vehicles and their 2.0T Engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

894.   VW knew or should have known that its conduct violated the Washington CPA.

895.   Washington Plaintiff and the Washington Sub-Class Members reasonably relied on VW's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

896.   Had Washington Plaintiff and the Washington Sub-Class Members known that the Class Vehicles would exhibit the Piston Defect, they would not have

purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of VW's misconduct.

897. VW owed Washington Plaintiff and the Washington Sub-Class Members a duty to disclose the truth about the Piston Defect because VW:

(a)    possessed exclusive and superior knowledge of the design of the Class Vehicles and the Piston Defect;

(b)    intentionally concealed the foregoing from Washington Plaintiff and the Washington Sub-Class Members; and/or

(c)    made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Washington Plaintiff and the Washington Sub-Class Members that contradicted these representations.

898. Due to VW's specific and superior knowledge that the Engines in the Class Vehicles will fail before their expected useful life has run due to the Piston Defect, its false representations regarding the increased durability of the Class Vehicles, and reliance by Washington Plaintiff and the Washington Sub-Class Members on these material representations, VW had a duty to disclose to Class members that the Piston Defect will cause engine failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the Engines will cause damage to Class Vehicle, and that Class members would be required to bear the cost of the damage to their vehicles.

899.   Having volunteered to provide information to Washington Plaintiff and the Washington Sub-Class Members, VW had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Washington Plaintiff and the Washington Sub-Class Members.

900.   Longevity, durability, performance, and safety are material concerns to VW consumers. VW represented to Washington Plaintiff and the Washington Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact it is only a matter of time before the engines fail due to the Piston Defect.

901.   Washington Plaintiff and the Washington Sub-Class Members suffered injury in fact to a legally protected interest. As a result of VW's conduct, Washington Plaintiff and the Washington Sub-Class Members were harmed and suffered actual damages in the form of the costs of diagnosis and repair of their vehicles, and the diminished value of their vehicles.

902.   As a direct and proximate result of VW's unfair or deceptive acts or practices, Washington Plaintiff and the Washington Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

903.    Defendant's violations present a continuing risk to Washington Plaintiff and the Washington Sub-Class Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

904.    As a proximate and direct result of VW's unfair and deceptive trade practices, Washington Plaintiff and members of the Washington Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. This included ascertainable losses in the form of actual damages in the amount of the cost to attempt to repair the Piston Defect, replaced the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

905.    The Washington Plaintiff and members of the Washington Sub-Class seek monetary relief against VW in the amount of actual damages, as well as punitive damages because VW acted with fraud and/or malice and/or was grossly negligent.

906.    VW is liable to Washington Plaintiff and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. Because VW's actions were willful and knowing, Plaintiffs' damages should be trebled.

## THIRTY-THIRD CAUSE OF ACTION
### Breach of Express Warranty
### (OR. REV. STAT. §§ 72.3130 AND 72A.2100)
### (On behalf of the Oregon Sub-Class against VWGoA)

907. Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

908. Plaintiff Grant Bradley ("Oregon Plaintiff") brings this cause of action individually and on behalf of the Oregon Sub-Class against VWGoA.

909. VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

910. With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

911. The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

912. VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described infra, which became a material part of the bargain. Accordingly, Defendants' express warranty is an express warranty under Oregon law.

913. The 2.0T Engine and its component parts were manufactured and/or installed in the Class Vehicles by VW and are covered by the express warranty.

914.   In a section entitled "What's Covered," the express warranty provides in relevant part that "The Basic Limited Warranty covers the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation." The warranty further provides that "You pay nothing for these repairs. These warranty repairs or adjustments—including all parts and labor connected with them—will be made by your dealer at no charge, using new or remanufactured parts."

915.   According to VWGoA, "Our New Vehicle Limited Warranty is simple – four years or 50,000 miles, whichever occurs first."

916.   VWGoA breached the express warranties by selling and leasing Class Vehicles with 2.0T Engine that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the 2.0T Engine and its component parts, and instead, replacing the defective 2.0T Engine and its components with equally defective 2.0T Engines and components. By simply replacing Oregon Plaintiff's and Oregon Sub-Class Members' defective 2.0T Engines with similarly defective parts, VWGoA has failed to "repair" the defects as alleged herein.

917.   The time limits contained in VWGoA's warranty period were also unconscionable and inadequate to protect Oregon Plaintiff and the Oregon Sub-Class Members. Among other things, Oregon Plaintiff and the Oregon Sub-Class Members

had no meaningful choice in determining these time limitations, the terms of which unreasonably favored VWGoA. A gross disparity in bargaining power existed between VWGoA and the Class members, and VWGoA knew or should have known that the Class Vehicles were defective at the time of sale.

918.   Oregon Plaintiff and the Oregon Sub-Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

919.   Because VWGoA has not been able remedy the Piston Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

920.   Plaintiff was not required to notify VWGoA of the breach or was not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the 2.0T Engine, and from other internal sources.  Oregon Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

921.   As a direct and proximate cause of the breach of express warranty by VWGoA, Oregon Plaintiff and the other Oregon Sub-Class members have suffered, and continue to suffer, damages, including economic damages at the point of sale or

lease. Additionally, Plaintiff and the other Oregon Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

922.   Oregon Plaintiff and the other Oregon Sub-Class members are entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

### THIRTY-FOURTH CAUSE OF ACTION
**Breach of the Implied Warranty of Merchantability
(OR. REV. STAT. §§ 72.3140 AND 72A.2120)
(On behalf of the Oregon Sub-Class against all Defendants)**

923.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

924.   Oregon Plaintiff brings this cause of action individually and on behalf of the Oregon Sub-Class against all Defendants.

925.   Defendants are and were each at all relevant times a "merchant" with respect to motor vehicles under Or. Rev. Stat. §§ 72.1040(1) and 72A.1030(1)(t), and a "seller" of motor vehicles under Or. Rev. Stat. § 72.1030(1)(d).

926.   With respect to leases, Defendants are and were each at all relevant times a "lessor" of motor vehicles under Or. Rev. Stat. § 72A.1030(1)(p).

927.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Or. Rev. Stat. §§ 72.1050(1) and 72A.1030(1)(h).

928.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Or. Rev. Stat. §§ 72.3140 and 72A-2120.

929.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed vehicles equipped with the 2.0T Engines to customers through authorized dealers, like those from whom Oregon Plaintiff and the Oregon Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Oregon Plaintiff and the Oregon Sub-Class Members, with no modification to the defective engines.

930.   VW provided Oregon Plaintiff and Oregon Sub-Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their 2.0T Engines suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

931.   VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other

things: (i) a warranty that the Class Vehicles and their 2.0T Engine, which were manufactured, supplied, distributed, and/or sold by VW, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their 2.0T Engine would be fit for their intended use.

932.   Contrary to the applicable implied warranties, the Class Vehicles and their 2.0T Engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Oregon Plaintiff and Oregon Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective 2.0T Engine.

933.   The Piston Defect is inherent and was present in each Class Vehicle at the time of sale.

934.   As a result of VW's breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Piston Defect, Oregon Plaintiff and Oregon Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' 2.0T Engine and/or its components are substantially certain to fail before their expected useful life has run.

935.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Or. Rev. Stat. §§ 72.3140 and 72A-2120.

936.   Oregon Plaintiff and the Oregon Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

937.   Oregon Plaintiff and the Oregon Sub-Class Members were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the Piston Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the engines or components thereof, and through other internal sources.  Oregon Plaintiff also provided notice when he presented his vehicle for repair at an authorized dealer.

938.   Because Oregon Plaintiff purchased his vehicle from an authorized VW dealer, he is in privity with VW since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

939.   As a direct and proximate cause of VW's breach, Oregon Plaintiff and the Oregon Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Oregon Plaintiff and the Oregon Sub-Class

Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

940.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Oregon Plaintiff and the Oregon Sub-Class Members have been damaged in an amount to be proven at trial.

## THIRTY-FIFTH CAUSE OF ACTION
### (Fraud by Concealment, Fraud by Omission, and/or Fraud in the Inducement)
### (On Behalf of the Class, or in the Alternative, on Behalf of the individual Sub-Classes, against all Defendants)

941.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1-274 of this Complaint.

942.   Plaintiffs bring this cause of action individually and on behalf of the Class, or in the alternative, on behalf of the individual Sub-Classes against all Defendants.

943.   VW concealed and suppressed and omitted material facts concerning the quality of the Class Vehicles, and the 2.0T Engines VW installed in Class Vehicles.

944.   VW concealed and suppressed and omitted material facts concerning the serious Piston Defect causing the pistons and the engine to consumer excessive oil and fail at any time. Discovery will show that the Piston Defect is in the design, manufacture, and/or workmanship of the piston rings and/or pistons/piston heads such that the piston rings do not seat properly in the grooves of the piston head. VW

knew that Plaintiffs and Class Members would not be able to inspect or otherwise detect the Piston Defect prior to purchasing or leasing the Vehicles. VW further failed to disclose and/or denied the existence the Defect when Plaintiffs and Class Members complained of the failure of their 2.0T Engines.

945.   VW did so in order to boost confidence in its vehicles and falsely assure purchasers and lessees of VW vehicles that the Class Vehicles were world-class, safe, warranted, and reliable vehicles, and concealed the information in order to prevent harm to VW and its products' reputations in the marketplace, to induce Plaintiffs and Class Members to purchase and/or lease the Class Vehicles, and to prevent consumers from learning of the defective nature of the Class Vehicles prior to their purchase or lease.

946.   These false representations and omissions were material to consumers, both because they concerned the quality of the Class Vehicles and because the representations and omissions played a significant role in Plaintiffs' and Class Members' decisions to purchase or lease the Class Vehicles.

947.   VW had a duty to disclose the Engine Defect in the Class Vehicles because it was known and/or accessible only to VW; VW had superior knowledge and access to the facts; and VW knew the facts were not known to or reasonably discoverable by Plaintiffs and Class Members.

948.    VW also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in the Class Vehicles as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the actual quality, comfort, and usability of Class Vehicles.

949.    Even when faced with complaints regarding the Defect, VW misled and concealed the true cause of the symptoms complained of as described above. As a result, Class Members were misled as to the true condition of the Class Vehicles once at the time of purchase or lease and again when the 2.0T Engine failure was complained of to VW.

950.    The omitted and concealed facts were material because they directly impact the value, appeal, and usability of the Class Vehicles purchased or leased by Plaintiffs and Class Members. Whether a manufacturer's products are as stated by the manufacturer, backed by the manufacturer, and usable for the purpose for which they were purchased/leased, are material concerns to a consumer.

951.    VW actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation, sustain its marketing strategy, and avoid recalls that would hurt the brand's image and cost money, and it did so at the expense of the Plaintiffs and Class Members.

952.   Discovery will show that VW has still not made full and adequate disclosure and continues to defraud Plaintiffs and Class Members and conceal material information regarding defects that exist in VW vehicles.

953.   Plaintiffs and Class Members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased their Class Vehicles or would have paid less for them. Plaintiffs' and Class Members' actions were justified. VW was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or Class Members.

954.   Because of the concealment and/or suppression of the facts, Plaintiffs and Class Members sustained damages because they negotiated and paid value for the Class Vehicles not considerate of the Engine Defect that VW failed to disclose, and they paid for temporary repairs and equally defective replacement parts to attempt to remedy the Defect. Had they been aware of the concealed Defect that existed in the Class Vehicles, Plaintiffs and Class Members would have paid less for their Vehicles or would not have purchased or leased them at all.

955.   Accordingly, VW is liable to Plaintiffs and Class Members for damages in an amount to be proven at trial.

956.   VW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights

and well-being to enrich VW. VW's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## RELIEF REQUESTED

870.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the 2.0T Engine, including the need for periodic maintenance;

(c)   An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' defective 2.0T Engine and/or its components with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the

Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d)   A declaration requiring Defendants to comply with the various provisions of the Song-Beverly Act alleged herein and to make all the required disclosures;

(e)   An award to Plaintiff and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(f)   Any and all remedies provided pursuant to the Song-Beverly Act, including California Civil Code section 1794;

(g)   Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(h)   Any and all remedies provided pursuant their various state law claims;

(i)   A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to

Plaintiffs and Class Members;

(j)     An award of attorneys' fees and costs, as allowed by law;

(k)     An award of pre-judgment and post-judgment interest, as provided by law;

(l)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(m)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues in this action so triable.


Dated: October 12, 2021          Respectfully Submitted,


/s/ Russell D. Paul
Russell D. Paul (NJ Bar. No. 037411989)
Amey J. Park (NJ Bar. No. 070422014)
Abigail J. Gertner (NJ Bar. No. 019632003)
Natalie Lesser (NJ Bar No. 017882010)
**BERGER MONTAGUE PC**
1818 Market Street
Suite 3600
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net

259

Tarek H. Zohdy (*pro hac vice*)
Cody R. Padgett (*pro hac vice*)
**CAPSTONE LAW APC**
1875 Century Park East
Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396
tarek.zohdy@capstonelawyers.com
cody.padgett@capstonelaywers.com

Ramzy P. Ladah
Adrian A. Karimi (*pro hac vice*)
**LADAH LAW FIRM**
517 S. 3rd St
Las Vegas, NV  89101
Telephone:   (702) 252-0055
Facsimile:    (702) 248-0055
Ramzy@ladahlaw.com
Adrian@ladahlaw.com

*Attorneys for Plaintiffs and the Proposed
Class and Subclasses*